UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARIE L. GARDNER, THE ESTATE OF FRANCIS R. COUGHLIN, M.D., THE ESTATE OF BARBARA B. COUGHLIN, JANICE B. FOSTER, and MARIE MILLER, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiffs,<br><br>   vs.<br><br>CONTINENTAL CASUALTY COMPANY,<br><br>            Defendant. | Civil Action No.: 3:13-cv-01918-JBA<br><br><br>REVISED SECOND AMENDED CLASS ACTION COMPLAINT<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Marie L. Gardner, The Estate of Francis R. Coughlin, M.D., The Estate of Barbara B. Coughlin, Janice B. Foster, and Marie Miller, ("Plaintiffs"), bring this action on behalf of themselves and all others similarly situated (the "Class") against Defendant Continental Casualty Company ( "Defendant" or "CNA").

## NATURE OF THE ACTION

1.    After decades of collecting tens of thousands of dollars in long term care insurance premiums from each of its elderly policyholders – and paying claims for years while these consumers entered assisted living facilities in the State of Connecticut – CNA abruptly changed its policy interpretation and began denying claims for stays in all Connecticut assisted

living facilities without alerting existing policyholders to this change in coverage. Upon orchestrating this covert change in policy interpretation that would save CNA millions of dollars in claims over the life of the policies at issue, CNA subsequently sought a 45% rate increase - which was later approved at 30% - from the State of Connecticut on this very group of policies.

2.      Defendant has engaged in an illegal course of conduct designed to reduce its exposure to costly long term care claims by denying claims of elderly insureds through a scheme of fraud, deception, and manipulation of policy terms, while seeking massive premium increases at the expense of these same insureds.

3.      Defendant has taken broad long term care insurance policies that, for years, covered stays at facilities ranging from assisted living to nursing homes, and converted them to "nursing home only" policies. A review of the policies at issue reveal that Connecticut assisted living facilities fall squarely within the policy definitions of Long Term Care Facility.

4.      Defendant's bad faith claim handling tactics are demonstrated by its practice of refusing to send claim forms, or open a claim in their system, for elderly insureds who contact CNA and indicate they intend to file a claim for a stay at a facility that CNA has determined is not covered - CNA is issuing verbal claim denials to elderly insureds, including insureds with Alzheimer's disease. The result is that insureds have no written record as to the basis for their claim denial, which severely limits their ability to obtain assistance with the claim process. This tactic on the part of CNA when an insured requests coverage for a stay at a facility determined by CNA as not covered, is shocking and unconscionable.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class

is a citizen of a different state than defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

6.      Venue is appropriate because Plaintiffs are residents of the State of Connecticut. Venue is also proper in this Court because Defendant systematically transact business in the State of Connecticut and the causes of action set forth in this Complaint, in part, arose in the State of Connecticut. The policies, moreover, were sold in Connecticut, premium payments were made from Connecticut, claim denial letters were sent from CNA to Connecticut, and the assisted living facilities for which coverage is sought are located in the State of Connecticut and regulated by the State of Connecticut.

**THE PARTIES**

7.      Plaintiff Marie L. Gardner ("Ms. Gardner") is a deceased individual who was residing at the assisted living facility The Village at Buckland Court ("The Village") located at 432 Buckland Road, South Windsor, CT 06074 up until the time of her death. Ms. Gardner was the owner of a CNA long term care insurance "LTC 1" policy, policy form number P1-15203-A06. *See* Exhibit A.

8.      Plaintiff the Estate of Barbara B. Coughlin ("Ms. Coughlin") is the estate of a recently deceased individual who was residing at The Village at Waveny ("Waveny"), an Alzheimer's unit licensed as an assisted living facility, located at 3 Farm Road, New Canaan, CT 06840 up until the time of her death. Ms. Coughlin was also an owner of the LTC 1 policy. The Estate of Ms. Coughlin is owed benefits under the LTC 1 policy.

9.      Plaintiff the Estate of Francis R. Coughlin, M.D., J.D., ("Dr. Coughlin") is the estate of a recently deceased individual who was residing at his home at 20 Mead Street, New Canaan, CT 06840 up until the time of his death. Dr. Coughlin and Ms. Coughlin had been

married for 62 years at the time of Dr. Coughlin's passing.  Dr. Coughlin was an owner of the policy until the time of his death. The Estate of Dr. Coughlin is owed benefits under the LTC 1 policy.

10.    Plaintiff Janice Foster ("Ms. Foster") is an 87 year old individual currently residing at The Atwater at McLean Assisted Living Center which is a licensed assisted living facility operating a Alzheimer's disease/dementia unit located at 75 Great Pond Road, Simsbury, CT 06070. Ms. Foster is also an owner of the LTC 1 policy.

11.    Plaintiff Marie Miller ("Ms. Miller") is an 87 year old individual currently residing in the Convalescent Care Home (a skilled nursing facility) Whitney Manor. Ms. Miller originally filed a claim for a stay at an assisted living facility but CNA denied her claim. Ms. Miller subsequently moved to Whitney Manor, a facility that CNA would cover. Ms. Miller is an owner of a "Con Care B" policy, policy form number P1-59433-A06. *See* Exhibit B.

12.    The Class consists of *all current and former CNA long term care policyholders of the following policy forms as described in CNA's Connecticut Department of Insurance Rate Filings: "Con Care B" (Forms 59433/59806) and "LTC 1" (Forms 15203/16356/16928/16944)*. All members of the Class have been, or will be, wrongfully denied long term care benefits for stays at assisted living facilities in the State of Connecticut. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

13.    Defendant CNA is the underwriter of the policies, had the authority to approve and/or deny claims under the policies, is financially responsible for claims made on the policies and other liabilities in connection therewith, and is headquartered in Illinois.

## FACTUAL ALLEGATIONS

14.     Long term care insurance provides benefits to an insured in the event that the individual's health situation requires a level of care that she cannot safely provide to herself.

15.     In order to qualify for long term care benefits under the policies, claimants are required to demonstrate (1) they are medically eligible and (2) that the facility at which they will reside meets the definition of a Long Term Care Facility. The primary issue raised in this litigation is whether assisted living facilities in the State of Connecticut meet the definition of a Long Term Care Facility as defined within the LTC 1 and Con Care B policies:

**"LTC 1" Policy Form**

LONG-TERM CARE FACILITY

A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1.      is licensed by the state where it is located; and

2.      provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3.      has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4.      keeps a daily medical record of each patient; and

5.      may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the

aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care, place which operates primarily for the treatment of alcoholics or drug addicts, or a hospice. However, care or services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision.

*See* Exhibit A.

**"Con Care B" Policy Form**

"Long Term Care Facility" means a Skilled Nursing Facility or a Custodial or an Intermediate Care Facility.

***

"Custodial or Intermediate Care Facility" means a place which:
1. is licensed by the State;
2. operates primarily to provide nursing care for three or more persons at those persons expense; and
3. provides continuous nursing care under the direction of a licensed registered nurse (RN) a licensed practical or vocational nurse (LPN or LVN) or a physician.

It is not a hospital or clinic; a home for the aged or mentally ill; a rest home; a community living center; or a place that provides domiciliary, residency, or retirement care; and it is not a facility which operates primarily for the treatment of alcoholics or drug addicts, even if it is a section of a nursing home.

***

"Custodial Care" means care which is mainly for the purpose of meeting daily living requirements. This level of care may be provided by persons without professional skills or training. Examples are: Help in walking, getting out (sic) bed, bathing, dressing, eating meals, and taking medications."

*See* Exhibit B.

16.     The State of Connecticut's licensing scheme for all assisted living facilities operating in the State is as follows: The Connecticut Department of Public Health ("DPH") either licenses a Managed Residential Community ("MRC") as an Assisted Living Services Agency ("ALSA") or the MRC can contract with a DPH licensed ALSA to provide assisted

living services.  Before an MRC can provide assisted living services to its residents, it must first

get approval from the DPH according to DPH Code 19-13-D105(c)(1) (*See* Exhibit C):

> Assisted living services may not be provided in a managed residential community unless the managed residential community has notified the department either in writing or by telephone of its intention to provide or arrange to make available licensed assisted living services and has submitted all information as required in this subsection and until the assisted living services agency has been issued a license to operate by the department.

17.     DPH regulations also indicate that an MRC can provide nursing services and even

medical treatment as long as the MRC is licensed as an ALSA or contracts with an ALSA:

> The managed residential community, through its service coordinator or any other representative, may not provide health services, including but not limited to the provision of rehabilitative therapy, administration or supervision of the self-administration of medications, nursing care or medical treatment, ***unless it has been licensed as an assisted living services agency***. It may contract with one or more assisted living services agencies, home health care agencies, or other appropriately licensed health care providers to make available health services for tenants provided by such licensed persons or entities. (Emphasis added).
>
> *See* Department of Public Health Code 19-13-D105(c)(6).

18.     Connecticut's State Department on Aging website notes that,

> An assisted living designation in this housing directory is reserved for managed residential communities that provide their residents with support services through an entity that is licensed by the Connecticut Department of Public Health as an Assisted Living Services Agency (ALSA). Each managed residential community may be the licensee or it may provide services through a contract with a licensed, assisted-living provider.[1]

19.     In fact, all MRC's operating in Connecticut must either be licensed as an ALSA

or contract with a licensed ALSA. *See* Conn. Gen. Stat. § 19a-694 ("(a) All managed residential

---

[1] http://www.ct.gov/agingservices/cwp/view.asp?a=2513&q=313066

communities operating in the state shall:…(2) Afford residents the ability to access services provided by an assisted living services agency.");

20.     Once the MRC facility becomes licensed as an ALSA, or contracts with a licensed ALSA, in order to provide assisted living services (including nursing services) to its residents, it becomes an assisted living facility licensed by the State of Connecticut.

21.     Plaintiffs are informed and believe, and thereupon allege, that the Connecticut Insurance Department, the Office of Policy and Management, and the Attorney General's office agree with this position - an MRC providing care to its residents under an ALSA license is considered to be a State of Connecticut licensed assisted living facility. On July 21, 2011 CNA through its counsel wrote to the Connecticut Insurance Department and explicitly stated, "***CNA's understanding is that, under state licensing regulations, the combination of an MRC and an ALSA is meant to constitute a Connecticut assisted living facility.***" (Emphasis added). This statement to the Insurance Department is wholly inconsistent with CNA's position in this matter - that MRC/ALSA combinations are not licensed facilities.

**Ms. Gardner's Claim Experience**

22.     In order to protect her assets from the high costs of long term care, on October 25, 1993 Ms. Gardner purchased the LTC 1 policy from Defendant.

23.     After paying tens of thousands of dollars in premiums over 15 years, in 2008 Ms. Gardner fell and broke her hip for a second time. After this fall, due to ongoing health issues and the need of assistance with her activities of daily living, Ms. Gardner, along with her husband who also had the same LTC 1 policy, moved to the assisted living facility The Village. Ms. Gardner and her husband subsequently filed long term care claims under the LTC 1 policy.

24.     On October 30, 2008, CNA approved Ms. Gardner's claim - and her husband's claim - with an effective date of June 10, 2008 and began paying the monthly benefit under the LTC 1 policy.

25.     After paying her claim for over two years, on February 11, 2011, CNA terminated Ms. Gardner's claim for medical reasons since Ms. Gardner's condition had improved somewhat as she had partially recovered from her broken hip. In a May 9, 2011 letter confirming this termination decision, CNA noted that:

> In the event that Ms. Gardner's care needs change or increase in the future, we would be pleased to review any new information submitted. In order to consider benefits, we will require documentation substantiating the provision of qualifying care and services to Ms. Gardner as outlined in her policy.

26.     On May 25, 2011, CNA notified Ms. Gardner that she must once again begin paying premiums on her policy in order to keep her coverage in place. Ms. Gardner remained at The Village and began paying for her stay, and her LTC 1 policy premiums, out of her own assets.[2]

27.     On April 28, 2012, Ms. Gardner fell down a flight of stairs and fractured her sacrum.  Ms. Gardner applied for policy benefits from CNA on May 8, 2012 given that she again now clearly qualified for long term care due to medical reasons.[3]

28.     Two months later on July 10, 2012, CNA provided Ms. Gardner with a chart entitled "Explanation of Benefits."  The "remarks" portion of the chart notes "Not a Qualified Provider Must be a licensed agency/facility[.]"  *See* Exhibit D.

29.     Plaintiff's daughter, Sheila Peterson, called CNA several times seeking an explanation as to what the chart meant.  After multiple attempts to reach someone at CNA, she

---

[2] Ms. Gardner continued to pay for her stay at The Village and her LTC 1 policy premiums out of her own assets up until the date of her death.
[3] Due to deterioration in Ms. Gardner's physical condition, CNA has raised no dispute that Ms. Gardner once again meets the medical requirements under the policy.

eventually received a call from Erica Braden, a claim representative at CNA.  Ms. Braden informed Ms. Peterson that Plaintiff's claim had in fact been denied.  Ms. Braden also explained the reason for the denial was that according to a "new law" Plaintiff's policy required a nurse to be on premise at The Village 24 hours a day in order for the facility to be covered by the LTC 1 policy.  During the conversation, Ms. Braden mentioned a class action settlement that now governs the terms of the policy, and noted that this was the reason for the claim denial.  Ms. Peterson eventually understood that the "new law" Ms. Braden was referring to was actually the terms of the *Pavlov* class action settlement discussed below.

30.   Ms. Peterson and Ms. Gardner were very confused given that CNA had previously paid Ms. Gardner's claim - and Ms. Gardner's husband's claim - for over two years at this very same assisted living facility.

31.   On July 27, 2012, Ms. Braden wrote to Plaintiff and provided her with information regarding the class action settlement in *Dorothea Pavlov, et al. v. Continental Casualty Company*, No. 07-02580, Doc. 107 (N.D. Ohio October 7, 2009) ("*Pavlov*").  Ms. Braden also noted in this letter that, "As you or a legal representative did not object to the settlement, it is now final and binding on you as a party thereto. Therefore, any claim for benefits submitted under your policy must be reviewed for compliance with the *Pavlov* settlement." *See* Exhibit E.

32.   Despite Ms. Braden's statements in her phone call with Ms. Peterson, the *Pavlov* settlement does not require a nurse on site 24 hours a day for a facility to be covered under the

LTC 1 policy. In fact, CNA's requirement that a nurse must be on site 24 hours day was the very issue that the *Pavlov* plaintiffs successfully challenged in their case.[4]

33.     On October 3, 2012, the Ms. Gardner's counsel wrote to CNA and explained that The Village has a nurse on call 24 hours a day and multiple nurses on site well over the 5 hours a day, 7 days a week described in the *Pavlov* settlement.

34.     On November 26, 2012, counsel for CNA responded to the October 3, 2012 letter stating that "[t]he primary basis for the denial of benefits for Ms. Gardner was (and remains) the fact that The Village is not a licensed facility, rather than the adequacy or inadequacy of its nurse staffing." *See* Exhibit F. However the November 26, 2012 letter acknowledges that The Village is an MRC that is licensed as an ALSA by the State of Connecticut DPH, but that somehow CNA still believes the facility is not licensed:

> The State of Connecticut licenses facilities providing skilled or intermediate nursing care.[FN omitted]. Unlike Vernon Manor, however, ***The Village is not a licensed facility. Rather, it is a managed residential community (MRC) which is not licensed by the state of Connecticut***. As noted in the enclosed informational packet from the Connecticut Department of Public Health, MRCs are facilities "consisting of private residential units that provides a managed group living environment, including housing and services primarily for persons age fifty-five (55) and over." As that document also indicates, residents of an MRC may receive assisted living services through an assisted living services agency (ALSA). ***The ALSA must be licensed through the state, and it is our understanding that The Village is a licensed ALSA. The facility itself, however, is not licensed.***
>
> You should be aware that in light of policy requirements that long-term care facilities be licensed, Continental Casualty has worked with the State of Connecticut Insurance Department to address MRCs at which ALSA services are provided. Continental Casualty has agreed with the Insurance Department that there are circumstances under which a long-term care policyholder might receive benefits related to services provided by an ALSA while the insured is a resident of an MRC. For example, benefits might be available where a policy provides coverage for home health care services or where the policy affords "Alternate Care Facility" (ACF) coverage. Here, Ms. Gardner's policy does not cover home

---

[4] The lead plaintiffs in the *Pavlov* matter were seeking coverage for stays at assisted living facilities, therefore CNA's current position that the LTC 1 policy is a "nursing home only" policy is completely unsupported by CNA's own conduct in entering the settlement of the *Pavlov* matter.

health care, nor does it contain an ACF benefit. Rather, the policy provides coverage solely for services rendered in a Long-Term Care Facility. Such coverage is not within the ambit of Continental Casualty's agreement with Connecticut. (Emphasis added).

35.     Plaintiffs are informed and believe, and thereupon allege, that at the time that CNA reached an alleged "agreement" with the Connecticut Insurance Department, CNA did not disclose to the Insurance Department that it had previously been covering stays at assisted living facilities under the same policies, nor did it make the Insurance Department aware of the *Pavlov* settlement that involved coverage issues with regard to assisted living facilities under the LTC 1 policy forms.

36.     Furthermore, while Ms. Gardner's policy does not contain an "Alternate Care Facility" provision, the policy does have a substantially similar "Alternate Plan of Care" provision which is discussed in detail below.

37.     The November 26, 2012 letter from CNA concludes that:

Regardless of the 'nursing services' requirement within the definition of Long Term Care Facility, therefore, and regardless of whether the requisite services are available at The Village, it cannot be disputed that The Village is not a facility licensed by the State of Connecticut. As such, it cannot qualify as a Long-Term Care Facility for purpose of the Continental Casualty policy, and Ms. Gardner's residence at The Village cannot qualify for benefits under the policy.

38.     After multiple requests CNA failed to provide any documentation of this alleged agreement with the Insurance Department.

39.     After a November 30, 2012 phone conversation between counsel for CNA and the undersigned counsel in which clarification of CNA's position was sought, since CNA was acknowledging that The Village was a licensed ALSA but was still refusing to admit liability, three months later on February 22, 2013 CNA provided a follow-up letter – over ten months after

Ms. Gardner filed her claim for benefits. *See* Exhibit G. The February 22, 2013 letter from

CNA's Bobbie Jo Dombey-Fersten, Lead Care Manager at CNA, noted that:

> Village at Buckland Court is a "Managed Residential Community" ("MRC")
> which provides residents with private apartment residences. It is not a facility
> providing Long Term Care to its residents, and is not licensed by the State of
> Connecticut to provide such care.  It does not provide skilled, intermediate, or
> custodial nursing care under the supervision of a physician or have 24-hour-a-day
> nursing services provided by or under the supervision of a registered or licensed
> nurse. Finally, it does not keep a daily medical record of each patient. Therefore,
> as discussed more fully below, Village at Buckland Court does not meet the
> requirements for a Long Term Care Facility.

40.     To the contrary, however, by Connecticut Department of Public Health regulation

19-13-D105, all MRC's licensed as ALSA's by the State of Connecticut (*i.e.* assisted living

facilities) (1) must be able to provide nursing services (2) must be under the supervision of a

physician on the mandatory quality assurance committee (certifications are also required from

the insured's treating physician or licensed healthcare provider), (3) must keep a daily medical

record for each patient, and (4) must have a registered nurse on call 24 hours a day in addition to

making available "nursing services on a twenty-four (24) hour basis[.]"

41.     After previously paying benefits for stays at assisted living facilities in

Connecticut for years – and without any change in the licensing scheme by the State of

Connecticut – sometime in 2009, CNA stopped approving these claims on the basis that MRC's

licensed as ALSA's (i.e. all Connecticut assisted living facilities) can never be considered a

facility licensed by the State of Connecticut as is required by the policies.

42.     On July 26, 2015, Ms. Gardener passed away.

**The Coughlins' Claim Experience**

43.     In order to protect their assets from the high costs of long term care, on December

5, 1992 the Coughlins purchased the LTC 1 policy from Defendant.

44.     After paying tens of thousands of dollars in premiums for over 20 years, in April 2012 the Coughlins moved from their home to Atria Darien, an assisted living facility. Dr. Coughlin suffered from multiple physical ailments and Ms. Coughlin suffered from Alzheimer's disease. Atria Darien provided the Coughlins with the nursing care they both needed and allowed them to stay together which was very important to them.

45.     On May 16, 2012 CNA denied the Coughlins' claims stating that:

> Atria Darien is a Managed Residential Community ("MRC") in the state of Connecticut. An MRC does not meet the requirements of the policy as a Long-Term Care Facility as it is not licensed by the state, does not provide skilled nursing care under the supervision of a physician and does not nave 24-hour-a-day nursing services by or under the supervision of a registered nurse (RN), licensed vocational nurse (LVN), or licensed practical nurse (LPN).

> *See* Exhibit H.[5]

46.      To the contrary, however, Atria Darien is licensed by the State as an ALSA, does provide nursing care (skilled, intermediate and/or custodial) under the supervision of a physician and does have 24 hour a day nursing services available to all residents under the supervision of a licensed nurse. Atria Darien meets the LTC 1 policy's definition of a Long Term Care Facility.

47.     On June 29, 2012 the Coughlins appealed this determination (*See* Exhibit I) however the decision was upheld by CNA on August 14, 2012. *See* Exhibit J.[6] As was the case with Ms. Gardner's appeal denial, CNA concluded that the facility was not licensed even though the license is issued in the name of the facility itself: "It is our understanding that Atria Darien residents receive such assisted living services through Atria Darien, a licensed ALSA."

48.     Dr. Coughlin subsequently returned to his home and began paying for at-home nursing care out of pocket.

---

[5] Mr. Coughlin received a substantially similar letter.
[6] Mr. Coughlin received a substantially similar letter.

49.     In January 2013, Ms. Coughlin moved from Atria Darien to Waveny where Dr. Coughlin believed her claim would be covered since Waveny is attached to a skilled nursing facility at the same address.

50.     On May 9, 2013 Dr. Coughlin and his attorney John Hetherington called CNA in order to initiate a claim for Ms. Coughlin's stay at Waveny.

51.     On May 15, 2013, despite refusing to speak with him and Dr. Coughlin the week prior because there was no signed release from Ms. Coughlin on file, Mr. Hetherington was contacted and told that Ms. Coughlin's care at Waveny would not be covered.

52.     Waveny is a Connecticut licensed assisted living facility, provides nursing care (skilled, intermediate and/or custodial) under the supervision of a physician and does have 24 hour a day nursing services available to all residents under the supervision of a licensed nurse and meets the definition of a Long Term Care Facility under the terms of the LTC 1 policy.

53.     Mr. Hetherington requested claim forms from CNA in writing on June 4, 2013 and again on June 19, 2013 with no response.

54.     On August 1, 2013, Mr. Hetherington called CNA to inquire on the status of the claim forms. Mr. Hetherington was told that CNA had record of the May 9, 2013 call initiating the claim, but that nobody from CNA had contacted Waveny, and the matter had been marked closed as of July 1, 2013. The CNA representative told Mr. Hetherington that the claim would be re-opened and that CNA would contact Waveny.

55.     On August 22, 2013, Mr. Hetherington called CNA and was told that Ms. Coughlin's claim was being reviewed and a decision would be made within 45 days of August, 1, 2013. As of November 1, 2013 Waveny had still not been contacted by CNA, and no decision had been communicated by CNA to the Coughlins.

56.     On January 3, 2014, the State of Connecticut's Office of the Healthcare Advocate ("OHA") called CNA on behalf of Ms. Coughlin in order to determine the status of Ms. Coughlin's claim. *See* Exhibit K. OHA was told that "there is no claim on file. The reason is when you call in to initiate a claim, it is evaluated as to whether it qualifies or not to be a claim. This request did not. She read logged calls to me from January and May of 2013 – the caller was informed the facility was not eligible or covered under the policy. Per Jessica, it is licensed as an Assisted Living Service Agency, and to qualify for a claim, it must have a Long Term Care license…I asked why there was no written determination sent to the client? Per Jessica, if no official claim is opened, it does not generate a client letter in their system." *Id.*

57.     Upon information and belief this practice does not occur when an insured first seeks coverage at a skilled nursing home and then is subsequently transferred to an assisted living facility - CNA only refuses to open a claim and send out a claim denial letter when the insured attempts to initiate the claim at an assisted living facility.

58.     On February 21, 2014, Dr. Coughlin passed away.

59.     On March 29, 2015, Ms. Coughlin passed away.

**Ms. Foster's Claim Experience**

60.     In order to protect her assets from the high costs of long term care, on August 1, 1992 Ms. Foster purchased the LTC 1 policy from Defendant.

61.     Due to cognitive decline and the need of assistance with activities of daily living, on November 12, 2013 Ms. Foster entered the skilled nursing home McLean Health Center. On November 25, 2013 Ms. Foster moved from the skilled nursing unit to the assisted living memory care unit on the same property: Atwater Memory Care Assisted Living at McLean ("Atwater at McLean"). Ms. Foster subsequently filed a claim with CNA under her policy.

62.     On February 13, 2014 Defendant wrote to Ms. Foster and stated in part that Atwater at McLean is not licensed to provide long term care by the State of Connecticut and otherwise does not meet the definition of a Long Term Care Facility under the terms of the LTC 1 policy. *See* Exhibit L.

63.     Atwater at McLean is a Connecticut licensed assisted living facility, provides nursing care (skilled, intermediate and/or custodial) under the supervision of a physician and does have 24 hour a day nursing services available to all residents under the supervision of a licensed nurse. Atwater at McLean meets the definition of a Long Term Care Facility under the LTC 1 policy.

64.     Ms. Foster suffers from cognitive impairment and presents a high risk of wandering, therefore she wears an ankle bracelet that locks any door at Atwater at McLean as she approaches. As with Ms. Gardner, and the Coughlins, CNA does not dispute that Ms. Foster meets the medical eligibility requirements under the LTC 1 policy.

65.     On February 21, 2014, CNA wrote to Ms. Foster and stated:

> As explained in our February 13, 2014 correspondence, McLean Health Center – MRC is not licensed to provide Long-Term Care by the state (sic) of Connecticut. Nor does the MRC provide the type of nursing care and 24-hour-a-day nursing services, or keep daily medical records, all as required under the Long-Term Care Facility definition in your policy. Accordingly, your policy does not afford Long-Term Care Facility coverage for the McLean MRC. However, the care charges for the services rendered by McLean Affiliates ALSA may be considered per the terms of the Home Health Care Benefit as defined on page 8 of your Comprehensive Home Health Care Rider[.]

> *See* Exhibit M.

66.    The benefits available to Ms. Foster under her Home Health Care Rider are far less than the benefits available to her under the terms of the LTC 1 policy's Long Term Care Facility benefit in part because they do not cover room and board.

67.    As part of the Home Health Care Rider benefit, CNA requested that Ms. Foster provide CNA with "Flowsheets/notes reflecting the daily delivery of services to you by McLean Affiliates ALSA. This documentation must be maintained by the ALSA per CT Public Health Code 19-13-D105(k)(2)(L)[,]" which inherently contradicts CNA's position that Atwater at McLean does not keep daily medical records.

**Ms. Miller's Claim Experience**

68.    On September 1, 1991 Ms. Miller purchased a long term care policy from the Defendant.

69.    In May 2011 Ms. Miller filed a claim for her stay at the assisted living facility Maple Woods at Hamden located in Hamden, Connecticut ("Maple Woods") based on her progressive dementia.

70.    Ms. Miller's daughter was told over the phone multiple times by separate CNA representatives that the assisted living facility Maple Woods would be covered under her Con Care B policy.

71.    Based on these representations, Ms. Miller moved in to Maple Woods and paid thousands of dollars in fees to initiate her stay.

72.    Shortly thereafter, CNA called Ms. Miller's daughter and stated that a mistake had been made and Maple Woods would not be covered.

73.    This position was documented in a CNA letter dated May 23, 2011 which stated that Maple Woods was not a Skilled Nursing Facility. *See* Exhibit N.

74.     For the same reason it denied Maple Woods, CNA also denied a subsequent claim in July 2011 when Ms. Miller inquired about a possible move to the dementia and Alzheimer's assisted living facility Arden Courts of Hamden ("Arden Courts").

75.     On August 5, 2011, the Connecticut Insurance Department forwarded CNA's July 21, 2011 correspondence to Ms. Miller which provided a more comprehensive explanation for its denial of Ms. Miller's claims. *See* Exhibit O. In this July 21, 2011 correspondence CNA explained in part that,

> Maple Woods is prohibited by Connecticut law from providing personal· care services of any kind to its residents. Conn. Agencies Reg., § 19-13-D 105(c)(l). Maple Woods is not licensed by the State of Connecticut, does not have nurses on staff, and does not provide nursing care. Maple Woods does not provide nursing or physician supervision of nursing care… Maple Woods apparently works with Benchmark Assisted Living ("Benchmark") to make personal care services available to its residents on a part-time, not continuous basis. Even if Maple Woods and Benchmark were considered together for purposes of LTCF Benefit coverage - and CNA believes they should <u>not</u> be - this combined entity would not qualify for facility benefits. Skilled Nursing Facilities require that nursing services be provided 24-hours-a-day, 7 days-a-week. Custodial or Intermediate Care Facilities require that such nursing care be "continuous." Benchmark (sic) services are not provided 24-hours-a-day or continuously. (Emphasis in original) (citations to exhibits omitted).

*Id*.

76.     To the contrary, however, as with all licensed assisted living facilities in the State of Connecticut, Maple Woods does provide nursing care (skilled, intermediate and/or custodial) under the supervision of a physician and does have 24 hour a day nursing services available to all residents under the supervision of a licensed nurse. Moreover, at the very least custodial nursing services such as assistance with activities of daily living are provided continuously for the residents.

77.   In short, Maple Woods meets the Con Care B policy definition of a Long Term Care Facility (as well as the LTC 1 definition) since it is a licensed assisted living facility in the State of Connecticut.

78.   Given the need for care, and her inability to afford paying for care at an assisted living facility out of pocket, Ms. Miller reluctantly moved to a substantially more expensive skilled nursing home so that CNA would pay her claim.

79.   Since skilled nursing facilities are generally far more expensive than assisted living facilities, CNA's current benefit payment to Ms. Miller does not cover the full amount of monthly charges from the skilled nursing home. The payment of monies out of pocket to cover the difference between her CNA benefit amount and her skilled nursing facility monthly bill, has caused Ms. Miller's assets to deteriorate - this would not have happened if her claim had been approved at Maple Woods or Arden Courts.

80.   Ms. Miller's health has noticeably deteriorated as a result of being financially forced into a skilled nursing home before her condition required this move.

**CNA's Scheme to Avoid Costly Claim Liability**

81.   Plaintiffs are informed and believe, and thereupon allege, that while reviewing all claims under the LTC 1 policies as part of the *Pavlov* settlement remediation process, CNA concocted different ways to increase claim denials and terminations. Rather than aid policyholders as was the intention, CNA used the remediation process of *Pavlov* as a way to invent new ways to avoid claim liability, thus post-*Pavlov*, it became more difficult for a long term care claim to be maintained and approved by CNA.

82.   Plaintiffs are informed and believe, and thereupon allege, that CNA does not terminate claims of policyholders residing at assisted living facilities who were on claim at the

time CNA changed its policy interpretations to exclude Connecticut assisted living facilities. However CNA denies new claims for stays at assisted living facilities, and this is true even if a previous claim had been paid at an assisted living facility as is the case with Ms. Gardner.

83.　　CNA continues to collect premiums from policyholders, some of whom previously had stays at assisted living facilities covered, without informing any policyholders of CNA's changed policy interpretation.

84.　　Defendant's new policy interpretation has been made very clear: due to the licensing structure of assisted living facilities in Connecticut, the policies do not cover stays at any assisted living facilities in the State.

85.　　DPH MRC/ALSA licensing aside, MRC's are also licensed to operate by other state actors such as the Town of South Windsor and other municipalities that are tasked with enforcing state-imposed and enforced fire and safety regulations.

86.　　Defendant's attempt to exploit the State of Connecticut's DPH regulatory scheme for assisted living facilities in order to avoid paying costly claims is unfair, deceptive, and illegal. CNA's unfair, deceptive, and illegal practice is not designed to address the level of nursing care that is provided at assisted living facilities (custodial, intermediate and/or skilled), but rather is based entirely on CNA's attempt to manipulate the assisted living regulatory framework so that it can escape a large amount of claim liability that it formerly carried in its policy and claim reserves. There is no dispute that Ms. Gardner, Ms. Coughlin, Dr. Coughlin, Ms. Foster, and Ms. Miller all qualify medically for coverage, the dispute is only about where they receive the necessary care.

87.　　CNA is attempting to create a regulatory loophole where none exists.

88.     Defendant's position in this matter, that MRC's cannot be licensed facilities or provide nursing services, is simply false - Department of Public Health Regulations explicitly state:

> The managed residential community, through its service coordinator or any other representative, may not provide health services, including but not limited to the provision of rehabilitative therapy, administration or supervision of the self-administration of medications, nursing care or medical treatment, ***unless it has been licensed as an assisted living services agency***. It may contract with one or more assisted living services agencies, home health care agencies, or other appropriately licensed health care providers to make available health services for tenants provided by such licensed persons or entities. (Emphasis added). Department of Public Health Code 19-13-D105.

89.     Indeed, for years CNA itself interpreted the policies as covering stays at assisted living facilities in the State of Connecticut, and only changed its interpretation when loss ratios on the group of policies became unmanageable. The policy forms at issue in this matter have extremely high loss ratios in the State of Connecticut.  In order to cover these losses, in early 2012, CNA sought a shocking 45% rate increase on many of its individual long term care policies (including the policies at issue here) held by elderly policyholders in the State of Connecticut. At the very time CNA was lobbying for higher rates – eventually securing permission for a 30% rate increase – it was now denying claims for stays at all assisted living facilities in Connecticut ***without ever alerting existing policyholders now facing 30% rate increases to this very significant change in policy interpretation***.

90.     Through manipulative claims practices CNA has turned broad long term care insurance policies that cover stays at facilities ranging from assisted living to nursing homes, into a policies that only covers stays at nursing homes.  This change drastically and immediately limits CNA's claim exposure.

91.     Additionally, the policies have an Alternate Plan of Care ("APC") benefit, which is supposed to address situations where a facility or treatment does not fit into the exact policy terms, but the policyholder is otherwise eligible for benefits based on their medical condition.  In addition to the other unfair, deceptive, and illegal acts described herein, in the alternative CNA has also refused to act in good faith and apply the APC benefit provision to assisted living facilities in Connecticut. For instance, CNA noted in its February 22, 2013 letter to Ms. Gardner (Exhibit G) that the APC provision is not intended to supplant the basic type of coverage afforded by the policy, and this means that it only covers stays in a Long Term Care Facility as is defined by CNA.  This interpretation is in direct contrast to the policy language that states the APC provision can be invoked when "different sites" may be more appropriate for a policyholder's care.  In fact, the LTC 1 policy even lists "Alzheimer's centers" as an example of an APC, yet CNA would not even send claim forms or initiate a claim for Ms. Coughlin's stay at Waveny and similarly did not cover Ms. Foster's claim at Atwood at McLean.

92.     CNA's interpretation and application of the APC provision in the policies would render it an illusory policy provision.

93.     Defendant's practice of not opening claims, not sending claim forms, and issuing denials for initial stays at assisted living facilities further impedes the Class members' ability to pursue and/or request consideration of their claim under the APC.

94.     As a result of the foregoing claims practices, all insureds covered by CNA long term care policy forms LTC 1 and Con Care B have been – or will be – wrongfully denied their rightful benefits when attempting to qualify for a stay at an assisted living facility in the State of Connecticut.

95.     The most blatant example of Defendant's bad faith practices with regard to its long term care policies is their practice of refusing to open a claim when an insured attempts to initiate a claim for a stay at a facility that CNA determines is not covered.

96.     This tactic is documented in a letter from Connecticut's OHA. *See* Exhibit K. The result is that claim forms are never sent to the policyholder, and no written denial letter is ever issued - *which makes it very difficult for an elderly insured to seek assistance from third-parties when there is no written basis for the claim denial*.

97.     In addition, given that many folks with Alzheimer's are physically healthy and would seek coverage for stays at assisted living facility Alzheimer's units, such as Ms. Coughlin, this sharp and unconscionable practice is disproportionately harming the most vulnerable of our citizens.

98.     No doubt for these reasons the Connecticut Legislature enacted Conn. Gen. Stat. § 38a-501(a)(2)(B) which provides that:

> (B)Each insurance company…delivering, issuing for delivery, renewing, continuing or amending any long-term care policy in this state shall, upon receipt of a written authorization executed by the insured, (i) disclose information to a managed residential community for the purpose of determining such insured's eligibility for an insurance benefit or payment, and (ii) provide *a copy* of the initial acceptance or declination of a claim for benefits to the managed residential community *at the same time such acceptance or declination is made to the insured*. (Emphasis added).

99.     Defendant's refusal to open claims and issue written denials to insureds for stays at facilities it deems as not covered is a violation of this statute Conn. Gen. Stat. § 38a-501(a)(2)(B).

100.     Defendant, in a bid to save itself tens to hundreds of millions of dollars in claims and reserves, has turned a block of policies that cover stays at assisted living facilities and

nursing homes into a block of policies that only cover nursing homes stays. In addition, it is now not opening claims for policyholders seeking stays at facilities determined as not covered. Thus, Plaintiffs and the members of the Class seek, *inter alia*, a temporary injunction that immediately stops Defendant's practice of verbal claim denials, damages representing their losses from wrongfully denied claims, and permanent injunctive relief that prevents Defendant from engaging in the conduct complained of herein. Unless the court issues an order declaring these practices to be illegal – and enjoining them in the future – Plaintiffs and the members of the Class will continue to be harmed by these deceptive and illegal practices.

## CLASS ALLEGATIONS

101.    This class action is brought on behalf of the Plaintiffs and the Class members to recover for the harm caused by Defendant's pattern of deceptive acts and practices as alleged herein.

102.    Defendant's violations of Conn. Gen. Stat. § 38a-815 are violations of Conn. Gen. Stat. § 42-110b(a) and give rise to a cause of action under Conn. Gen. Stat. § 42-110g(a) and (b).

103.    Throughout the Class Period, Defendant engaged in deceptive acts and practices and defrauded members of the Class by denying claims that Defendant's knew should have been paid under the terms of the policies. Rather than abide by the terms of the policies, Defendant affirmatively and deliberately engaged in a scheme to wrongfully deny claims where CNA's liability was clear.

104.    In addition, Defendant has intentionally engaged in the bad faith claim practice of refusing to open a claim, send claim forms, and issue a written denial when a Class member expresses intent to seek coverage for a stay at a facility determined by Defendant as not covered. The result is that insureds seeking coverage for a particular facility that CNA has determined is

not covered, are being denied the opportunity to file a written claim and receive a written denial, which severely limits their ability to seek assistance in disputing CNA's verbal decision to deny coverage. These unfair, deceptive, and illegal actions taken by CNA harmed, and continue to harm, Plaintiffs and the other members of the Class.

105.    The acts, practices and conduct of which Plaintiffs complain commonly affect the Class.

106.    All members of the Class seek injunctive relief that would prevent CNA from excluding all claims for stays at Connecticut assisted living facilities.

107.    All members of the Class seek immediate injunctive relief that would prevent CNA from continuing its practice of not opening claims when a Class member attempts to initiate a claim for a stay at a facility CNA has determined is not covered and not issuing written claim denials explaining the basis for the denial.

108.    Members of the Class who have had claims for stays at a Connecticut assisted living facility denied, and Members of the Class who were never given an opportunity to initiate a claim for a stay at a Connecticut assisted living facility, on the grounds that CNA determined the assisted living facility does not meet the definition of a Long Term Care Facility seek monetary damages.

109.    The Class, as defined above, is identifiable and unambiguous based on objective information and criteria in the possession of Defendant.

110.    Upon information and belief CNA records phone conversations with insureds therefore policyholders who were denied the ability to initiate a claim are readily identifiable based on records in the possession of Defendant.

111.    The Plaintiffs are members of the Class.

112.    The members of the Class are so numerous that joinder is impractical.  Based upon CNA rate filing information published by the Connecticut Department of Insurance, as of December 31, 2010, the Class is comprised of at least 400 individuals based in Connecticut, and at least 22,814 individuals nationwide with policy form LTC 1 and at least 341 individuals based in Connecticut, and at least 16,817 individuals nationwide with policy form Con Care B.

113.    There are questions of law and fact common to the members of the Class, which questions predominate over any individual issues.

114.    The claims and defenses of Plaintiffs are typical of the claims of all members of the Class.  By proving their cases, the Plaintiffs will simultaneously prove the case of the members of the Class.

115.    The Plaintiffs will fairly and adequately represent the Class.  Plaintiffs are willing and able to serve as representatives of the Class, and have no knowledge of any possible divergent interest between or among Plaintiffs and any member of the Class.  Plaintiffs have retained highly competent counsel experienced in class actions and complex litigation to provide representation on behalf of the Plaintiffs and the Class.

116.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

117.    The prosecution of separate actions would also create a substantial risk of adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

118.    Questions of law and fact common to members of the Class predominate over any questions affecting individual members. The determinative facts and legal principles apply universally among Plaintiffs and the members of the Class.  Indeed, the predominant legal issue in this case, which cuts across the entire Class, is whether Defendant breached a legal duty universally owed to the Plaintiffs and the members of the Class in denying all long term care claims for stays at assisted living facilities in the State of Connecticut in bad faith. If liability against Defendant is established on the basis of the common facts applied to universally applicable principles of law, then damages can be precisely calculated based on objective data.

119.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy for reasons including that, due to the expense of pursuing individual litigation regarding Defendant's common course of conduct alleged herein, members of the Class would, as a practical matter, be effectively precluded from protecting and enforcing their legal rights.

## <u>COUNT I</u><br><u>(CONNECTICUT UNFAIR TRADE PRACTICES ACT)</u>

120.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

121.    Defendant has acted, as alleged herein, in the conduct of trade or commerce as defined in Conn. Gen. Stat. § 42-110a(4).

122.    Defendant owed a duty to fairly, promptly and equitably settle claims made by Plaintiffs and Class members for long term care benefits under the policies and CNA failed to meet this duty when it changed policy interpretations in order to reduce its actual and potential claim exposure, and also refused to open claims, send out claim forms and issue written claim

denials when insured's communicated their intent to seek coverage for a stay at a facility determined as not covered by CNA.

123.    In addition, Defendant had a duty of disclosure based on its continued collection of premiums from insureds while knowing that Class members would likely be misled into thinking that stays at Connecticut assisted living facilities would continue to be covered as they had in the past.  This fact is especially true given the 30% rate increase approval Defendant secured in July of 2012 from the State of Connecticut.

124.    Defendant has also intentionally engaged in the bad faith claim practice of refusing to open a claim, send claim forms, and issue a written denial when a Class member expresses intent to seek coverage for a stay at a facility determined by Defendant as not covered. The result is that insureds seeking coverage for a particular facility that CNA has determined is not covered, are being denied the opportunity to file a written claim and receive a written denial, which severely limits their ability to seek assistance in disputing CNA's verbal decision to deny coverage. These unfair, deceptive, and illegal actions taken by CNA harmed, and continue to harm, Plaintiffs and the other members of the Class.

125.    Defendant has regularly been engaged, as part of its general business practices, in the following intentional conduct: (a) wrongfully misrepresenting the terms of the policies, specifically, the Long Term Care Facility definitions and its application to the Connecticut licensing scheme regulating assisted living facilities; (b) wrongfully making such misrepresentations to policyholders for the purpose of avoiding payment of the claims; (c) wrongfully charging and obtaining an increased premium for the policies from the Plaintiffs and the Class members without disclosing that they will no longer be covering stays at assisted living facilities in Connecticut; (d) misrepresenting the terms of the *Pavlov* class action settlement in

communications with LTC 1 policyholders in order to deceive claimants into thinking that their failure to object to the settlement has forestalled their ability to challenge claim denials on grounds not directly addressed by the *Pavlov* settlement; (e) supplying false, misleading, inaccurate, untimely and incomplete information about the policies and Connecticut's licensing scheme regulating assisted living facilities; and (f) failing to open a claim, send out claims forms, and issue a written denial when a Class member requests coverage for a stay at a facility determined as not qualified by CNA which violates Conn. Gen. Stat. § 38a-501(a)(2)(B).

126.   Defendant's failure to deal fairly, honestly, in good faith and in a timely manner with the Plaintiffs and the Class, as outlined above, violates the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-815. Further, Defendant's conduct as described above is part of a general business practice in that the change in policy interpretation to exclude all Connecticut assisted living facilities from coverage, and CNA's practice of not opening claims for stays at facilities determined to be not qualified, admittedly applies to all policyholders and is a violation of Conn. Gen. Stat. § 38a-816(6) which prohibits unfair claim settlement practices. In addition to the above described conduct violating Conn. Gen. Stat. § 38a-816(6)(A-H, L, N) CNA's attempt to pay Ms. Foster's claim under the lesser value Home Health Care Rider when CNA knows that Ms. Foster is eligible under the Long Term Care Facility benefit is specifically prohibited by Conn. Gen. Stat. § 38a-816(6)(M): "failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage[.]"

127.   Defendant's misrepresentations and omissions regarding the benefits of the policies also violate Conn. Gen. Stat. § 38a-816(1) and (2) in that Defendant's

misrepresentations and false information led insureds, who renew their policies each year, into believing that claims for stays at Connecticut assisted living facilities would be paid under the policies as they had in the past and also misled LTC 1 insureds into thinking the *Pavlov* settlement forestalled their ability to enforce other LTC 1 policy terms.

128.    Defendant's failure to open a claim, send claims forms and/or pay claims, for stays at Connecticut assisted living facilities are also violations of Conn. Gen. Stat. § 38a-816(15) in that the payments withheld by Defendant are used to pay health care providers of the insureds.

129.    Defendant's violations of CUIPA are violations of the Connecticut Unfair Trade Practices Act ("CUTPA") Conn. Gen. Stat. § 42-110b(a) and give rise to causes of action under Conn. Gen. Stat. § 42-110g(a) and (b).

130.    Defendant's conduct is part of a general business practice that constitutes unfair and deceptive acts in violation of Conn. Gen. Stat. § 42-110b(a).

131.    As a direct and proximate result of Defendant's violation of CUTPA, Conn. Gen. Stat. § 42-110b(a), Plaintiffs and the Class members have suffered ascertainable losses under Conn. Gen. Stat. § 42-110g(a) and (b) in an amount to be proved at trial.

132.    As a result of Defendant's unfair and/or deceptive acts or practices, Defendant has reaped ill-gotten profits and gains based on its withholding of benefits under the policies, which it otherwise would not have received and which, in equity, they should be required to disgorge. Plaintiffs and the Class are not seeking disgorgement of premiums going back to the date of policy execution - they seek disgorgement in connection with wrongfully withheld benefits, including but not limited to the policies' Waiver of Premium Benefit and Long Term Care Facility Benefit.

133.    Defendant is liable, pursuant to Conn. Gen. Stat. § 42-110g(a), for punitive damages.

134.    Defendant is also liable, pursuant to Conn. Gen. Stat. § 38a-816(15), for 15% interest on unpaid claims.

135.    Furthermore, Defendant is liable, pursuant to Conn. Gen. Stat. § 42-110g(d), for costs and reasonable attorneys' fees.

136.    In compliance with Conn. Gen. Stat. § 42-110g(c), a copy of this First Amended Complaint has been submitted via email to the Attorney General of the State of Connecticut and Connecticut's Commissioner of Consumer Protection on this date. A copy has also been submitted to the Connecticut Insurance Department.

<u>**COUNT II**</u>
<u>**(UNJUST ENRICHMENT)**</u>

137.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

138.    Defendant has benefited by charging, collecting and retaining long term care insurance premiums, and not paying policy benefits to which the Plaintiffs and the Class members were entitled.

139.    The Defendant is unjustly retaining benefits owed to the Plaintiffs and Class. Plaintiffs and the Class are not seeking a return of premiums going back to the date of policy execution - they seek wrongfully withheld benefits, including but not limited to the policies' Waiver of Premium Benefit and Long Term Care Facility Benefit.

140.     As a direct and proximate result of Defendant's charging, collection, and retention of the premiums without paying out the benefits Plaintiffs and the Class were entitled, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

**COUNT III**
**(BREACH OF CONTRACT)**

141.     Plaintiffs hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

142.     Defendant formed an agreement and entered into a contract with Plaintiffs and the Class including offer, acceptance, and consideration (hereinafter called the "Contract").

143.     Pursuant to that Contract, Plaintiffs and the Class paid money to Defendant in exchange for Defendant providing a long term care insurance policy to Plaintiffs and the Class. Defendant received premiums in exchange for the issuance of a policy of long term care insurance.

144.     The Contract included, without limitation, Defendant's right to charge a premium in exchange for its promise to pay all claims promptly and justly when all requirements under the policies have been met.

145.     Plaintiffs and the Class performed their obligations under the contract by paying the premiums charged by Defendant.

146.     Defendant is obligated pursuant to the Contract, without limitation, to "pay [Plaintiff's and the Class'] claim[s] immediately after [CNA] receive[s] due written proof of loss."

147.     Defendant is also obligated to honor the Waiver of Premium Benefit in the policies when an insured qualifies for coverage, which Defendant has not.

148.    Defendant breached the Contract by, without limitation, denying all claims for stays at assisted living facilities in the State of Connecticut and thereby denying all associated Waiver of Premium Benefit claims as well.

149.    Defendant further breached the Contract by refusing to send out claim forms or open a claim when a Class member requested coverage for stays at a facility determined by CNA as not covered.

150.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

### COUNT IV
### (BAD FAITH)

151.    Plaintiffs hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

152.    Defendant acting through its officers, agents, servants and/or employees, acted unreasonably and in bad faith in refusing to pay claims for policyholders' stays at assisted living facilities in the State of Connecticut.

153.    Defendant acting through its officers, agents, servants and/or employees, acted unreasonably and in bad faith in refusing to open a claim, send out claims forms and issue written claim denials for stays at facilities determined by CNA as not covered.

154.    In addition to all of the reasons stated above, CNA's bad faith is further exemplified by its self-serving and unsupported change in policy interpretation after paying claims for years at assisted living facilities in order to reduce its claim exposure while simultaneously seeking approval for a 45% rate increase from the State of Connecticut.

155.    CNA's bad faith is also demonstrated by its misrepresentation of the terms of the policy and Connecticut's assisted living facility regulatory scheme.

156.    Lastly, CNA's failure to act in a timely manner with respect to the adjudication of Plaintiffs' claims, and its inability to provide a clear statement as to the basis for its claim denials is additional evidence of bad faith.

## APPLICATION FOR TEMPORARY INJUNCTION
## AND PERMANENT INJUNCTION

157.    Because Defendant has engaged in the unlawful acts and practices described above, Defendant has violated and will continue to violate the law as alleged in this Complaint. Unless immediately restrained by this Honorable Court, Defendant will continue to violate the laws of the State of Connecticut, as well as other states, and cause immediate, irreparable injury, loss and damage to the Plaintiffs and the Class - which is composed of many vulnerable elderly individuals. Therefore, in addition to monetary damages, Plaintiffs request a Temporary Injunction and Permanent Injunction preventing CNA from refusing to open claims and refusing to issue written claim denials when an insured seeks coverage for a stay at a facility determined by CNA as not covered. This practice is documented in a letter from the OHA attached as Exhibit K.

158.    Because Defendant has engaged in the unlawful acts and practices described above, Defendant has violated and will continue to violate the law as alleged in this Complaint. Unless restrained by this Honorable Court, Defendant will continue to violate the laws of the State of Connecticut, as well as other states, and cause immediate, irreparable injury, loss and damage to the Plaintiffs and the Class - which is composed of many vulnerable elderly individuals seeking coverage for stays at Connecticut assisted living facilities. Therefore, in addition to monetary damages, Plaintiffs request a Permanent Injunction as indicated below.

**REQUEST FOR RELIEF**

Wherefore, Plaintiffs pray for judgment and relief in their favor and against Defendant as follows:

A.      Plaintiffs pray that Defendant be cited according to law to appear and answer herein; that after notice and hearing, a TEMPORARY INJUNCTION be issued; and upon final hearing a PERMANENT INJUNCTION be issued, restraining and enjoining Defendant, Defendant's successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendant, ordering that Defendant open claims and issue written claim denials when an insured seeks coverage at a facility determined by CNA as not covered.

B.      Plaintiffs pray that Defendant be cited according to law to appear and answer herein; that after notice and hearing, a PERMANENT INJUNCTION be issued, restraining and enjoining Defendant, Defendant's successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendant, from engaging in the acts or practices complained of herein.

C.      Declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and Conn. Gen. Stat. § 42-110g(b), and for an order certifying this case as a class action;

D.      Declaring that: (a) Plaintiffs and the Class members can qualify for benefits under the policies' Long Term Care Facility language, for stays at assisted living facilities in the State of Connecticut; (b) Defendant was obligated to pay claims of

36

Plaintiffs and Class members made for qualifying stays at assisted living facilities in the State of Connecticut; and (c) Defendant violated Connecticut law by attempting to avoid liability of these claims and engaging in bad faith claims handling practices to effectuate this mass claim manipulation scheme while simultaneously increasing premium rates;

E.  Issuing a permanent injunction requiring Defendant to identify and notify in writing all policyholders who have a "LTC 1" or "Con Care B" long term care policy, that their claims for qualified stays at assisted living facilities in the State of Connecticut will once again be covered;

F.  Issuing a permanent injunction requiring Defendant to cease and desist its pattern and practice of misrepresenting the terms and applicability of the *Pavlov* settlement;

G.  Awarding compensatory damages with interest on behalf of Plaintiffs and the Class members in an amount to be proved at trial;

H.  Awarding punitive damages;

I.  Ordering Defendant to disgorge all ill-gotten profits and gains related to their scheme;

J.  Awarding Plaintiffs and the Class all expenses, costs and disbursements incident to the prosecution of this action, including reasonable attorneys' fees; and

K.  For such other and further relief as allowed by law and/or as is equitable under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 28, 2015

THE PLAINTIFFS,
MARIE L. GARDNER, THE ESTATE OF
BARBARA B. COUGHLIN, THE ESTATE OF
FRANCIS R. COUGHLIN, MD, JANICE B.
FOSTER, AND MARIE MILLER
BY SEAN K. COLLINS, ATTORNEY AT LAW,
GLANCY, BINKOW & GOLDBERG LLP, AND
HASSETT & GEORGE, P.C.
THEIR ATTORNEYS


/s/ Sean K. Collins
SEAN K.COLLINS (ct29296)

SEAN K. COLLINS (ct29296)
Sean K. Collins, Attorney at Law
184 High Street, Suite 503
Boston, MA 02110
Telephone: 617-320-8485
Fax: 617-227-2843
sean@neinsurancelaw.com

LIONEL Z. GLANCY
EX KANO S. SAMS II
KARA WOLKE
Glancy Binkow & Goldberg LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-201-9150
Fax: 310-201-9160
lglancy@glancylaw.com
esams@glancylaw.com
kwolke@glancylaw.com

LOUIS GEORGE (ct02192)
JEFFREY O. MCDONALD (ct28195)
Hassett & George, P.C.
945 Hopmeadow Street
Simsbury, CT 06070
Telephone: 860-651-1333
Fax: 860-651-1888
lgeorge@hgesq.com
jmcdonald@hgesq.com

Attorneys for Plaintiffs and the Class

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2015, a copy of the foregoing Revised Second Amended Class Action Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

   /s/ Sean K.Collins

SEAN K. COLLINS (ct29296)