IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------x
                                                 :
MARIE L. GARDNER, ET AL.                         :         3:13 CV 1918 (JBA)
                                                 :
v.                                               :
                                                 :
CNA FINANCIAL CORPORATION, ET AL.                :         DATE: JANUARY 8, 2016
                                                 :
                                                 :
-------------------------------------------------x
```

RECOMMENDED RULING ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On December 27, 2013, plaintiff Marie L. Gardner ["Gardner"], individually and on behalf of all others similarly situated, commenced this action pursuant to 28 U.S.C. § 1332(d)(2)(A) against CNA Financial Corporation ["CNA"] and Continental Casualty Company ["Continental"] for violations of the Connecticut Unfair Trade Practices Act ["CUTPA"], fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, breach of contract, money had and received, and bad faith. (Dkt. #1).[1]  On March 24, 2014, plaintiff Gardner, along with the estate of Francis R. Coughlin, M.D. ["Dr. Coughlin"], Barbara B. Coughlin ["Coughlin"],[2] and Janice B. Foster ["Foster"], filed an First Amended Class Action Complaint on behalf of themselves and all others similarly situated, alleging the same claims as alleged in the original Complaint. (Dkt #17; see also Dkts. ##12-13).[3] That same day,

---

[1]Attached to plaintiffs' complaint are the following six exhibits: copy of Continental Casualty Company Long-Term Care Insurance Policy (Exh. A); copy of Explanation of Benefits for Gardner, dated July 10, 2012 (Exh. B); copy of letter from Erica Braden, Care Coordinator, to Gardner, dated July 27, 2012 (Exh. C); copy of letter from Attorney Douglas J. Morrissey to Sean K. Collins, dated November 26, 2012 (Exh. D); and copy of  letter from Bobby Jo Dombey-Fersten, LCSW, to Sean K. Collins, dated February 22, 2013 (Exh. E).

[2]After the passing of Coughlin, Dr. Coughlin and Gardner, their estates have continued the lawsuit. (Dkts. ##105, 138; see also Dkts. ## 101, 103, 134).

[3]Attached to plaintiffs' Amended Complaint are the following twelve exhibits: another copy of Continental Casualty Company Long-Term Care Insurance Policy (Exh. A); copy of  Department

plaintiffs filed the pending Motion for Preliminary Injunction and brief in support. (Dkt. #18). On May 29, 2014, defendants filed their Response to Plaintiff's Motion for Preliminary Injunction. (Dkt. #41; see also Dkts. ##32-33).[4]   On October 1, 2014, this motion was referred to this Magistrate Judge by U.S. District Judge Janet Bond Arterton. (Dkt. #59).

On October 22, 2014, plaintiffs Gardner, the Estate of Dr. Coughlin, Coughlin, Foster and Marie Miller filed a Second Amended Class Action Complaint on behalf of themselves and

---

of Public Health Code § 19-13-D105 (Exh. B); another copy of Explanation of Benefits for Gardner, dated July 10, 2012 (Exh. C); another copy of letter from Braden, dated July 27, 2012 (Exh. D); another copy of letter from Attorney Morrissey, dated November 26, 2012 (Exh. E); another copy of letter from Dombey-Fersteb, dated February 22, 2013 (Exh. F); copy of letter from Tonya McNeese to Coughlin, dated May 16, 2012 (Exh. G); copy of letter from Coughlin and her sons Daniel and David Coughlin to CNA, dated June 29, 2012 (Exh. H); copy of letter from Heather Bates to Coughlin, dated August 14, 2012 (Exh. I); copy of letter from Frances S. Matkowski, RN, to Attorney John Hetherington, dated January 9, 2014 (Exh. J); copy of letter from Beth Foxall to Foster, dated February 13, 2014 (Exh. K); and copy of letter from Heather Bates to Foster, dated February 21, 2014 (Exh. L).

[4]Attached to defendants' response are the following twenty-two exhibits: Declaration of Christine Michals-Bucher, sworn to May 29, 2014 (Exh. 1), with the following subexhibits: copy of letter from Melinda Stanley to Gardner, dated May 29, 2012 (Exh. A); another copy of letter sent from Dombey-Fersten, dated February 22, 2013 (Exh. B); copy of letter from Angela Boley to Foster, dated December 13, 2013 (Exh. C); another copy of letter from Foxall, dated February 13, 2014 (Exh. D); another copy of letter from Bates, dated February 21, 2014 (Exh. E); copy of letter from Lakesha Simms to Coughlin, dated April 19, 2012 (Exh. F); copy of a letter from Lakesha Simms to Dr. Coughlin, dated April 19, 2012 (Exh. G); another copy of letter McNeese, dated May 16, 2012 (Exh. H); copy of a letter from Tonya McNeese to Dr. Coughlin, dated May 16, 2012 (Exh. I);  copy of a letter from Alisa Mueller to Coughlin, dated July 10, 2012 (Exh. J); copy of a letter Alisa Mueller to Dr. Coughlin, dated July 10, 2012 (Exh. K); another copy of letter from Bates, dated August 14, 2012 (Exh. L); copy of letter from Heather Bates to Dr. Coughlin, dated August 14, 2012 (Exh. M); copy of letter from Heather Bates to Coughlin, dated October 22, 2012 (Exh. N); copy of letter from Heather Bates to Dr. Coughlin, dated October 22, 2012 (Exh. O); copy of a Continental telephone log entry, dated December 26, 2012 (Exh. P); copy of a Continental telephone log entry, dated January 3, 2013 (Exh. Q); copy of a Continental telephone log entry, dated January 4, 2013 (Exh. R); copy of letter from Michael Blankshain to Richard Fisher, dated January 8, 2013 (Exh. S); copy of Continental telephone log entry, dated January 8, 2013 (Exh. T); copy of Continental telephone log entry, dated July 2, 2013 (Exh. U); and copy of letter from Michael Blankshain to Richard Fisher, dated January 8, 2013 (Exh. V).

Copies of unpublished case law were attached as Exh. 2.

Defendant filed a Motion to Dismiss Plaintiff's First Amended Class Complaint on June 16, 2014. (Dkt. #50). This motion was later withdrawn through a stipulation of the parties. (Dkts. ##60-62).  See note 6 infra.

all others similarly situated against defendant Continental[5] alleging CUTPA violations, unjust enrichment, breach of contract, and bad faith (Dkt. #63),[6] to which defendant Continental filed its Answer on December 2, 2014. (Dkt. #68; see also Dkts. ##64-65). On November 21 and December 1, 2014, plaintiffs filed their reply briefs (Dkts. ##66-67),[7] and on January 9, 2015, plaintiffs filed a Supplemental Statement of Facts in Support of their Motion for Preliminary Injunction. (Dkt. #73; see also Dkts. ##71-72).[8]

On February 2, 2015, the Motion for Preliminary Injunction was terminated, without prejudice to renew, by agreement of counsel for both sides, in light of their ongoing mediation. (Dkt. #83; see also Dkt. #85). On June 16, 2015, plaintiffs filed a motion seeking leave to file additional evidence in support of their Motion for Preliminary Injunction, which motion was granted the same day, and plaintiffs subsequently filed their Second Supplemental Statement of facts in support of the Motion for Preliminary Injunction two days

---

[5]In their Revised Second Amended Complaint, filed August 28, 2015 (Dkt. #106), CNA was eliminated as a defendant. However, plaintiffs continue to use the abbreviation "CNA" to refer to Continental. (See Dkt. #139, at 1).

[6]The day prior, the parties filed a Stipulation (Dkt. #60), to which sixteen exhibits were attached.

[7]Attached to plaintiffs' reply briefs are the following seven exhibits: Power Point presentation titled: "Claims Experience for Carriers with Large Inforce Blocks" (Exh. A); copy of letter from Frances Matkowski, RN, to Attorney John Hetherington, dated January 9, 2014 (Exh. B); notice of manual filings of audio recordings (Exhs. C-E); another copy of Continental Long-Term Insurance Policy (Exh. F); and copy of letter from Attorney John Hetherington to Pam Harrison, dated June 4, 2013 (Exh. G).

[8]Attached to plaintiffs' Supplemental Statement of Facts are the following eighteen exhibits: copy of transcript of telephone call on December 6, 2010 (Exh. A); notices of manual filing of audio recordings (Exhs. B, D, F, H, J, L, N, P, R); copy of transcript of telephone call on March 10, 2011 (Exh. C); copy of transcript of telephone call on July 27, 2012 (Exh. E); copy of transcript of telephone call on August 15, 2012 (Exh. G); copy of transcript of telephone call on January 3, 2013 (Exh. I); copy of transcript of telephone call on July 16, 2013 (Exh. K); copy of transcript of telephone call on August 1, 2013 (Exh. M); copy of transcript of telephone call on January 3, 2014 (Exh. O); and copy of transcript of telephone call on February 11, 2014 (Exh. Q).

later. (Dkts. ##88-91).[9] One week later, defendant filed its response to the supplemental statement. (Dkts. ##92-94).[10]

On August 28, 2015 and again on November 9, 2015, plaintiffs the Estate of Gardner, the Estate of Coughlin, the Estate of Dr. Coughlin, Foster and Miller filed their Revised Second Amended Complaint and Second Revised Second Amended Class Action Complaint against defendant Continental, with the same four causes of action. (Dkts. ##106, 139).[11] Currently pending before Judge Arterton is plaintiffs' Motion to Certify Class. (Dkt. #108; see also Dkts. ##107, 109-20, 125-27, 135-37, 143-47).[12]

For the reasons stated below, plaintiffs' Motion for Preliminary Injunction (Dkt. #18) is denied without prejudice to renew if plaintiffs' Motion to Certify Class is granted.

## I. DISCUSSION

In their Motion for Preliminary Injunction, plaintiffs request "that this Court issue an order immediately enjoining [d]efendant[] from refusing to open claims and issue written claim denials when an insured seeks coverage for a stay at a facility determined by [d]efendant[] as not a covered facility under the insured's long term care policy." (Dkt. #18, Brief at 5).[13] Plaintiffs later clarified that they seek to enjoin defendant so that it "compl[ies]

---

[9]The following four exhibits were attached: copy of e-mail from Christine Michals-Bucher to Colleen Broomhead, dated July 16, 2010 (Exh. A); copy of Inakte-Complete (Facility & HHC) form (Exh. B); and defendant's computer entries (Exhs. C-D).

[10]Attached as Exh. A was another computer entry.

Both plaintiffs and defendant received permission to file these documents under seal. (Dkts. ##90-94, 100, 102).

[11]Fifteen exhibits were attached to Dkts. ##106 and 139.

[12]Pending before this Magistrate Judge is plaintiffs' Motion to Compel, filed October 5, 2015. (Dkt. #122; see also Dkts. ##121, 124, 129-33, 140-42).

[13]All pagination will correspond to the page numbers assigned by CM/ECF.

with Conn. Gen. Stat. §§ 38a-816(6)(n) and 38a-501(a)(2)(B) and issue[s] all coverage decisions related" to Managed Residential Communities ["MRCs"] "to both insureds and the MRC in writing." (Dkt. #67, at 13).

A. FACTUAL BACKGROUND

Plaintiffs possess long-term care insurance policies through Continental that provide benefits in the event that an individual's health situation deteriorates to a point where she can no longer safely care for herself. (Dkt. #139, at 3-5; <u>see also</u> CNA Long-Term Care Basics,

https://www.cna.com/portal/site/groupLTC/gltcpublic/?vgnextoid=a15b9c132d018210Vgn VCM1000005e780c0aRCRD& (last visited July 20, 2015)). Plaintiffs contend that in order to qualify for benefits under such a policy, a claimant must show (1) that she is medically eligible and (2) that the facility at which the claimant will reside meets the definition of a Long Term Care Facility. (<u>Id.</u> at 5-6; <u>see also</u> Dkt. #18, Brief at 7). The parties dispute whether an MRC in Connecticut can become a licensed assisted living facility, a necessary qualification to become approved under the policy as a Long Term Care Facility. (<u>Compare id.</u> <u>with</u> Dkt. #41, at 6-7).

Plaintiffs claim that in the state of Connecticut, an MRC can become a licensed assisted living facility by either becoming licensed through the state's Department of Health as an Assisted Living Service Agency ["ALSA"], or by contracting with a Department of Health licensed ALSA. (Dkt. #18, Brief at 7). Conversely, defendant claims that under Connecticut law, MRCs are explicitly prohibited from providing the assisted living services that are covered by these policies. (Dkt. #41, at 6-7).

Plaintiffs also allege that defendant previously approved claims to certain MRC

facilities but, under pressure to improve its profit margins, intentionally changed its policies in order to make it more difficult for long-term care claims, which generally have a high loss ratio, to be approved. (Dkt. #18, Brief at 8-11). Plaintiffs claim that these practices have violated CUTPA and resulted in unjust enrichment, breach of contract, and bad faith. (Dkt. #139, at 28-35).

Finally, and most relevant to the current motion, plaintiffs allege that defendant is deliberately avoiding opening claims for individuals seeking long term care benefits and is failing to send out written notices after such claims have been denied. (Dkt. #18, Brief at 11-12; see also Dkt #139, at 35). Plaintiffs claim that this failure to send written notices causes irreparable harm because claimants "are left wondering why their claims for long term care . . . are being denied, and what their options are moving forward[,]" and that "[i]t is very difficult for an elderly insured to seek assistance from third-parties when there is no written basis for claim denial." (Id. at 16)(emphasis omitted). Plaintiffs also claim that failing to send written notices violates CONN. GEN. STAT. § 38a-501(a)(2)(B) which provides that

> each insurance company . . . issuing for delivery, renewing, continuing or amending any long-term care policy in this state shall, upon receipt of a written authorization executed by the insured, . . . provide a copy of the initial acceptance or declination of a claim for benefits to the managed residential community at the same time such acceptance or declination is made to the insured.

(See Dkt. #18, Brief at 6-7). Because of this alleged failure to send written notices, plaintiffs seek a preliminary injunction, on behalf of both the named plaintiffs and the putative class of plaintiffs, requiring defendant to "comply with Conn. Gen. Stat. §§ 38a-816(6)(n) and 38a-501(a)(2)(B) and issue all coverage decisions related to MRCs to both insureds and the MRC in writing." (Dkt. #67, at 16).

Defendant responds that it has a procedure in place to make sure that claimants

receive a written denial for their claims. (Dkt. #41, at 7-8). Defendant, relying on the

declaration of Christine Michals-Bucher, the Vice President of Long Term Care Operations

at Continental, claims that:

> When a policyholder contacts Continental regarding a potential request
> for benefits, it is Continental's policy and procedure to have an intake specialist
> interview the policyholder. If the policyholder has begun to receive services, it
> is Continental's policy and procedure to have a claim file opened, whether or not
> the claim ultimately is approved or denied.
>
> When a claim is denied, it is Continental's policy and procedure to issue
> a written claim denial in a letter to the policyholder, and to maintain that letter
> in the policyholder's file.

(Dkt. #41, Declaration of Christine Michals-Bucher ["Decl."] at 1-2; see also Dkt. #41, at 7-

8). Defendant also attests that "[t]his was the policy and practice followed with each named

plaintiff here. For each of them, Continental 'opened' a claim file and issued a claim denial

letter[,]" and that the only basis for the current motion is the "unique experience" of

Coughlin. (Dkt. #41 at 8, Decl., Exhs. A-M).[14]

### 1. PLAINTIFF GARDNER

The parties do not dispute that Gardner applied for and was issued a long-term care

insurance policy from Continental on or around October 25, 1993. (See Dkt. #68, at 10).

Similarly, the parties do not dispute that in 2008, after fracturing her hip, Gardner moved

into The Village at Buckland Court ["The Village"] and made a claim under her long-term

care policy to cover the services provided at that facility; this claim was approved on October

30, 2008, with an effective date of June 30, 2008. (Id. at 11). The parties further do not

dispute that on or around February 11, 2011, Gardner was informed that she no longer had

a qualifying impairment as defined by her policy, she resumed paying her long-term care

---

[14]Coughlin's experience will be discussed further in Section I.A.2 infra.

insurance policy premiums, and she chose to begin paying for her stay at The Village out of her own assets. (Id. at 11-12).

On April 28, 2012, Gardner fell down a flight of stairs and fractured her sacrum. (Dkt. #18, Brief at 12). She subsequently applied for policy benefits on May 8, 2012 (id.) and three weeks later, on or around May 29, 2012, received a letter acknowledging this request for benefits. (Dkt. #41, Decl., Exh. A). On July 10, 2012, Gardner was sent an "Explanation of Benefits" that listed The Village as "Not a Qualified Provider[,] Must be a licensed agency/facility[.]" (Dkt. #17, Exh. C; Dkt. #60, Exh. D). On July 27, 2012, Sheila Peterson, Gardner's daughter, spoke with a claims representative from CNA, Erica Braden, about this denial of the claim[15] and was informed that due to the "Pavlov . . . litigation settlement with insurance companies"[16] that Gardner's claim at The Village Court would be denied; Braden sent information regarding the Pavlov settlement to Peterson that same day. (Dkt. #73, Exh. E at 1-6; Dkt. #60, Exh. E; see also Dkt. #73, Exh. G at 1-2). Plaintiffs allege that the information provided contained only general facts about the Pavlov settlement and did not detail how the settlement related to the denial of Gardner's claim. (Dkt. #73, at 7). Plaintiffs further assert that the denial of Gardner's claim was unrelated to the Pavlov settlement and was actually based on the licensing of assisted living facilities in Connecticut. (Id.). On August 15, 2012, Peterson spoke with another claims representative and was provided with information about how to appeal a denied claim (Dkt. #73, Exh. G); during this conversation, the representative did not offer to send a written denial of the claim, which

---

[15]Peterson originally called on July 19, 2012. (Dkt. #73, at 4). During the July 27 call, Braden explained that she had "been out of the office sick," and hence was unable to return the call until that time. (Id., Exh. E at 1).

[16]Braden was referring to the settlement agreement reached in Dorothea Pavlov, et al. v. Continental Casualty Company, No. 07-02580 (N.D. Ohio filed August 24, 2007) ["Pavlov"].

plaintiffs cite as evidence of a "general practice . . . to not issue claim denials in writing[.]" (Dkt. #73, at 7). On October 3, 2012, plaintiffs' counsel sent a letter to defendant regarding the denied claim, and on November 26, 2012, defendant responded  by letter, explaining that the "primary basis for the denial of benefits for [] Gardner was (and remains) the fact that The Village is not a licensed facility." (Dkt. #60, Exh. F at 1). On February 22, 2013, defendant sent plaintiffs' counsel a written denial of the request for Long Term Care benefits for services rendered to Gardner at The Village. (Dkt. #41, Decl., Exh. B). On July 16, 2013, plaintiffs' counsel contacted a claim representative and discussed the denial of benefits. (Dkt. #73, Exh. K). Plaintiffs argue that information received during this call supports their belief that "CNA changed its position related to the licensing of Connecticut assisted living facilities while performing an internal claim reassessment in the wake of the <u>Pavlov</u> settlement" and that Gardner's experience of having a claim paid for a certain facility previously, "followed by a subsequent denial at the very same facility, was not isolated[.]" (Dkt. #73, at 10).

### 2. PLAINTIFF COUGHLIN

The parties do not dispute that on or around December 5, 1992, Coughlin applied for and was issued a long-term care insurance policy by Continental. (Dkt. #68, at 18-19). On December 6, 2010 and on March 10, 2011, Coughlin's husband and son, respectively, called defendant to discuss the coverage provided by Coughlin's long-term care policy. (Dkt. #73, Exhs. A, C). In April 2012, plaintiffs claim that Coughlin moved into Atria Darien, an assisted living facility, in order to receive nursing care for her Alzheimer's disease. (Dkt. #139, at 14; <u>see also</u> Dkt. #41, Dec.l, Exh. F). On or around May 16, 2012, Coughlin received a letter denying her request for benefits under the long-term care policy because Atria Darien "does not meet the policy requirements as a Long Term Care Facility." (Dkt.

#60, Exh. H at 1). On June 29, 2012, Coughlin, with the assistance of her family, appealed this decision through a letter to defendant; attached to Coughlin's letter were letters from a member of the Atria Darien staff and from Coughlin's doctor, both disagreeing with defendant's decision to deny the claim. (Dkt. #60, Exh. I; see also Dkt. #41, Decl.,Exh. J). On August 14, 2012, the denial of Coughlin's claim was upheld. (Dkt. #60, Exh. J).

Plaintiffs claim that after this denial, Coughlin relocated to the Village at Waveny ["Waveny"] where she believed her claim would be covered, and that, on May 9, 2013, Coughlin's husband and his attorney, John Hetherington, called and spoke to a claim representative about initiating a new claim for Coughlin at Waveny. (Dkt. #139, at 15; see also Dkt. #41, Decl.,Exh. T). On May 15, 2013, Attorney Hetherington was advised that Coughlin's care at Waveny did not qualify for coverage under her policy; he requested claims forms from defendant in writing on June 4 and June 9, 2013 but did not receive a response. (Dkt. #18, Brief at 14).[17] Plaintiffs contend that on August 1, 2013, Attorney Hetherington called defendant to follow up on the state of the claims forms only to learn that the matter had been closed on July 1, 2013; he was assured that the claim would be reopened and that defendant would contact Waveny. (Id.; see also Dkt. #73, at 10-11 & Exh. M). Three weeks later, Attorney Hetherington again reached out to defendant and was informed that the claim was under review and a decision would be made within forty-five days of August 1, 2013; however, as of November 1, 2013, no decision had been communicated to Waveny or Coughlin or her representatives. (Id.). Plaintiffs then claim that on January 3, 2014, the

---

[17]Defendant claims that, although not mentioned in plaintiffs' filings, Attorney Hetherington spoke with a claim representative on July 2, 2013, who explained the reasons for Coughlin's claim at Waveny being denied. (Dkt. #78, at 3-5 & Exh. B). Defendant also highlights that during this conversation, the claim representative gave Hetherington her direct extension in case he had any additional questions about the claim; however, on August 1, 2013, he instead chose to call the general customer service line and "feign[] ignorance[.]" (Id. at 5).

State of Connecticut's Office of the Healthcare Advocate contacted Continental on Coughlin's behalf only to be told that there was no claim on file and that Coughlin had not received a written notification because, despite a record of telephone logs from January and May 2013, an official claim had not been generated. (Id. at 14-15; see also Dkt. #73, at 11-12 & Exh. O). Plaintiffs assert that, as of the filing of plaintiffs' reply brief on December 1, 2014, Coughlin had yet to receive a written explanation from Continental as to why her claim was not being covered under her policy. (Dkt. #67, at 5).

Defendant's filings and the accompanying exhibits set forth additional and contradictory assertions to plaintiff's allegations. Defendant claims that Coughlin's original claim for her stay at Atria Darien resulted in a claim file being opened and a written denial being sent to her by letter. (Dkt. #41, at 8; see id. Decl., Exhs. F, H). This decision was appealed and defendant's decision to uphold the denial, along with a second written denial, was sent to Coughlin. (Id.; see id. Decl., Exhs. J, L). Defendant claims that Coughlin then contacted the Connecticut Insurance Department seeking a further review of defendant's decision. (Id.; see id. Decl.,Exh. N). Defendant further alleges that while both sides were debating the claim in front of the Connecticut Insurance Department, Coughlin's representatives called defendant to discuss whether Waveny would meet the requirements of the insurance policy (id.; see id. Decl., Exhs. P-S) and were informed that Waveny was not covered. (Id. at 8-9; see id. Decl., Exhs. Q-V).[18] Therefore, defendant claims that Coughlin, or her representatives, had already received multiple letters as well as telephone

---

[18]In plaintiffs' Supplemental Statement of Facts in Support of their Motion for Preliminary Injunction, they acknowledge a January 3, 2013 telephone call in which Coughlin's son was informed that Waveny's Alzheimer's unit would not be covered under his mother's policy. (Dkt. #73, at 8-9). However, plaintiffs contend that defendant still erred by not providing a written explanation for the denial of benefits after this conversation. (Id.).

calls explaining why MRCs were not covered under the policy. (Id. at 9).

### 3. PLAINTIFF FOSTER

The parties do not dispute that plaintiff Foster purchased a long-term care policy from defendant on or around August 1, 1991, and on or around November 25, 2013, filed a claim for benefits for her stay at Atwater Memory Care Assisted Living at McLean. (Dkt. #68, at 23-24). On February 11, 2014, Foster's son spoke with a claim representative and explained that he had never received a written denial for his mother's claim despite having spoken with another representative at the end of January 2014 and being assured that he would receive one. (Dkt. #73, Exh. Q at 2). He explained that he had tried to follow up numerous time but had been unsuccessful in his attempts to speak with the original claim representative. (Id.). The representative with whom he spoke on February 11 confirmed that the file showed the denial of the facility but did not show "any formal letter going out[.]" (Id. at 3). The parties agree that on or around February 13, 2014, defendant issued a letter to Foster explaining that the facility did not meet the definition of a long-term care facility as defined in her policy. (Dkt. #68, at 24; Dkt. #60, Exh. L). Plaintiffs acknowledge that Foster received a written denial for her claim, but highlight the fact that this denial was not sent until requested by her son. (Dkt. #73, at 12).

### 4. ADDITIONAL EVIDENCE

In plaintiffs' Second Supplemental Statement of Facts in Support of their Motion for Preliminary Injunction, plaintiffs contend that the discovery in this case has revealed "at least three instances in Connecticut, in addition to Ms. Gardner and Ms. Coughlin, where . . . claims were not opened despite the insured already residing at a facility, and verbal claim denials were issued to these insureds over the telephone." (Dkt. #90, at 3)(footnote

omitted). Plaintiffs claim that this contradicts defendant's assertion that it has an official policy in place to issue written denials of claims. (Id.). Plaintiffs also claim that discovery has revealed documents showing that defendant "was made aware by its legislation monitoring contractor" that it was required to provide notice to both the MRC and the insured, but continued to refuse to do so. (Id. at 2-3). Defendant claims that the three examples provided by plaintiff do not demonstrate that defendant does not provide written denials of claims. (Dkt. #94, at 2-3). Defendant also claims that the information defendant received from its legislation monitoring contractor is irrelevant because interpreting this statute is "a matter of law for the Court to decide, not a factual matter to be decided based on evidence about what Continental was told about the statute." (Id. at 2)(citation omitted).

### B. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary and drastic remedy [that] is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90  (2008)(citations & quotations omitted).  In each case, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter v. Nat'l Resources Defense Council, Inc., 555 U.S. 7, 24 (2008)(internal quotations & citations omitted).

To succeed on a motion for preliminary injunction, the moving party must show "(a) irreparable harm, and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and that the balance of hardships tip decidedly in favor of the moving party." Citigroup Global Markets,

<u>Inc. v. VCG Special Opportunities Master Fund Ltd</u>, 598 F.3d 30, 35 (2d Cir. 2010)(citations & internal quotations omitted); <u>see MacDermid, Inc. v. Selle</u>, 535 F. Supp. 2d 308, 315 (D. Conn. 2008)(citation omitted).   The "court must consider whether irreparable injury is <u>likely</u> in the absence of an injunction, [the court] must balance the competing claims of injury, and [the court] must pay particular regard for the public consequences in employing the extraordinary remedy of injunction."   <u>Salinger v. Colting</u>, 607 F.3d 68, 79 (2d Cir. 2010)(internal quotations & multiple citations omitted)(emphasis in original).   A "movant must show a greater than fifty percent probability of success on the merits."   <u>Citigroup Global Markets</u>, 598 F.3d at 34-35.

### 1. IRREPARABLE HARM

Defendant contends that plaintiffs lack standing to seek a preliminary injunction on behalf of either themselves or the putative class members in this lawsuit. (Dkt. #41, at 12-14). Defendant claims that because Coughlin has now been informed, either in writing or through the efforts an attorney, of why her claim was denied and has failed to demonstrate a likelihood of this same harm befalling her in the future, she lacks standing for an injunction. (<u>Id.</u> at 14-15). Plaintiffs reply that Coughlin does have standing because she has still not received a written explanation for why her claim at Waveny was denied coverage. (Dkt. #67, at 5, 10-11). Additionally, plaintiffs argue that "the threat of a reduction or termination of medical benefits constitutes irreparable injury that warrants the issuance of preliminary injunction[]" and that, in this circuit, "where plaintiffs assert claims on behalf of a class of similarly-situated individuals, courts may grant preliminary injunctions based upon the harm faced by members of the putative class[.]" (<u>Id.</u> at 11)(citation omitted). Finally, plaintiffs claim that because they allege that defendant's "conduct has caused similar injury

to others . . . such allegations demonstrate a general business practice and state a claim for violation of the Connecticut Unfair Insurance Practices Act ["CUIPA"] through the enforcement provision of [CUTPA]." (Id. at 12).

"[A] plaintiff must demonstrate standing for each claim [s]he seeks to press." Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 64 (2d Cir. 2012)(internal citations & quotations omitted). "[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of future or continuing harm" and "[a]lthough past wrongs may serve as evidence bearing on whether there is a real and immediate threat of repeated injury, such evidence does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." Pungitore v. Barbera, 506 F. App'x 40, 41 (2d Cir. 2012)(emphasis in original), citing City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)(internal quotations omitted); see also Robidoux v. Celani, 987 F.2d 931, 938 (2d Cir. 1993)("For a plaintiff to have standing to request injunctive or declaratory relief, the injury alleged must be capable of being redressed through injunctive relief at that moment[.]")(internal citations & quotations omitted).

Plaintiffs claim that the "actual and imminent" harm that plaintiffs face is the "failure to receive written explanations regarding policy coverage decisions – information that is vital to their decision-making regarding their health care at a critical stage in their life when finances can be extremely tight and plans need to be made[.]" (Dkt. #67, at 10). However, as defendant points out, Coughlin's representatives had already been informed that MRCs in general were not covered under her policy, and specifically that Waveny, like Atria Darien, would not satisfy the policy. (Dkt. #41, at 14-15, Decl., Exhs. P-S, U-V). Additionally, she continued to reside at Waveny after her claim was denied. (Dkt. #67, at 10). Therefore,

15

plaintiff Coughlin is unable to show "any continuing, present adverse effects[]" from her failure to receive a written notice and she does not have standing to seek the preliminary injunction.

Similarly, while plaintiffs claim that Gardner has standing because she did not receive a written notice of the denial of her claim at The Village "until well after she hired an entire attorney at her own expense, and almost a full year after she filed her claim[,]" she received a notice and could not show any continuing adverse effects. (Dkt. #67, at 10)(emphasis in original). Additionally, she did not have to change facilities because of the lack of a written denial of her benefits (Dkt. #51, at 13), and presented no facts that she would be wronged again without this injunction. See Spiro v. Healthport Technologies, LLC, No. 14 Civ. 2921(PAE), 2014 WL 4277608, at *7 (S.D.N.Y. Aug 29, 2014)("Here, even assuming that plaintiffs had adequately pled that they suffered a past injury redressable via a damages remedy, they have failed to plead facts that would permit the plausible inference that they are in danger of being "wronged again."). Finally, plaintiffs' counsel, while on a telephonic conference call with Judge Arterton, conceded that none of the named plaintiffs faced the irreparable harm of moving out of a facility because they had received an oral, rather than written, denial of benefits. (Dkt. #51, at 13-15).  Therefore neither Gardner nor Coughlin had standing to seek a preliminary injunction.

Plaintiffs further allege that they are permitted to seek a preliminary injunction on the basis of harm faced by members of the putative class. (Id. at 16-17). In their reply brief (Dkt. #67, at 11-12), plaintiffs rely upon Strouchler v. Shah, 891 F. Supp. 2d 504, 517-19 (S.D.N.Y. 2012), and Ligon v. City of New York, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013)("[c]ertain circumstances give rise to the need for prompt injunctive relief for a named

plaintiff or on behalf of a class and . . . the court may conditionally certify the class or otherwise award a broad preliminary injunction, without a formal class ruling, under its general equity powers")(internal citations, quotations & footnote omitted).[19] However, both of these cases also acknowledge that in order to use these general equity powers on behalf of the class, at least one named plaintiff must first have standing. Strouchler, 891 F. Supp. 2d at 517 ("It is true that named plaintiffs must have standing to assert claims on behalf of the class[.]"); Ligon, 925 F. Supp. 2d at 522 (finding that plaintiffs had standing "[a]s a preliminary matter[]" before beginning preliminary injunction analysis); see also Spiro, 2014 WL 4277608, at *7 ("[T]he named plaintiffs in [a class] action must themselves have standing to seek injunctive relief."), quoting Dodge v. Cnty. of Orange, 103 F. App'x 688, 690 (2d Cir. 2004).

Additionally, this is not an appropriate situation in which to issue a broad preliminary injunction prior to the class being certified because plaintiffs have failed to provide adequate evidence that the putative class members are suffering from the irreparable harm that plaintiffs are alleging. While courts differ on the exact level of evidence required to demonstrate that irreparable harm is befalling a putative class, plaintiffs have failed to provide evidence that would satisfy even the most lenient standard.

In United Steelworkers of America, AFL-CIO  v. Textron, Inc., 836 F.2d 6 (1st Cir. 1987), in an opinion written by future U.S. Supreme Court Justice Stephen Breyer, the First Circuit addressed the level of evidence required to demonstrate that a putative class is suffering from irreparable harm. While upholding the district court's grant of a preliminary

---

[19]This decision is one of many by U.S. District Judge Shira A. Scheindlin of the Southern District of New York and by the Second Circuit regarding the former "stop and frisk" policies by the New York Police Department.

injunction ordering the defendant, which had ceased paying medical insurance premiums for its retired employees, to resume the payments, the First Circuit considered the "specific, undisputed" fact that the defendant had not paid medical insurance premiums for approximately 200 retired workers. Id. at 8. The First Circuit also considered some "general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm[,]" including, inter alia, that most members of the putative class were not rich, that most lived on fixed incomes, that many would get sick and need medical care, that medical care is expensive, and, therefore, that medical insurance is a necessity. Id. As proof of these general facts, the Court accepted a single affidavit stating that three members of the putative class had suffered a reduction in medical care as a result of the termination of benefits. Id. at 8-9.

However, in Adams v. Freedom Forge Corp., 204 F.3d 475 (3d Cir. 2000), the Third Circuit established a more stringent evidentiary standard by requiring "a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed[.]" Id. at 487. The Third Circuit recognized that this standard could be met in a representative fashion "so long as the plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated–in terms of irreparable harm– to all the other plaintiffs" by "present[ing] affidavits, deposition testimony or other evidence[.]" Id. The Third Circuit then found that the plaintiffs had failed to lay such a foundation because out of the eleven plaintiffs who testified,[20] only three had shown irreparable, rather than monetary, harm and only two of those had demonstrated a likelihood of success on the merits. Id. at 479-80, 488.

---

[20]The class consisted of 136 plaintiffs. Id. at 480.

The Second Circuit, in <u>LaForest v. Former Clean Air Holding Co., Inc.</u>, 376 F.3d 48 (2d Cir. 2004), discussed these differing standards but chose to "leav[e] open whether, in this Circuit, <u>Textron</u>, <u>Adams</u>, or something in between is the governing approach[,]" and emphasized that this issue "is a case -sensitive inquiry[.]" <u>Id.</u> at 58. In <u>LaForest</u>, the district court, after granting summary judgment in favor of the plaintiffs, also granted an injunction on behalf of the named plaintiffs and putative class members ordering that the defendant comply with a previous agreement to provide a higher level of health benefits for certain retirees, vested employees, and surviving spouses. <u>Id.</u> at 50-51. In granting this injunction, the district court relied upon the "affidavits of six people entitled to benefits under the [previous agreement]" to find that the failure to pay these benefits "caused irreparable harm to the putative class." <u>Id.</u> at 56. On appeal, the Second Circuit affirmed this decision and found that the six affidavits, along with the fact that "every member of the class was either an employee of the same firm or is a surviving spouse of such an employee, and defendants d[id] not contest the fact that the <u>average</u> age of the approximately 600 retirees at issue [wa]s 83 years old[,]" was enough evidence to show that the irreparable harm was class wide, regardless of whether the <u>Adams</u> or <u>Textron</u> standard was used. <u>Id.</u> at 58 (emphasis in original).

Following the decision in <u>LaForest</u>, U.S. District Judge Shira A. Scheindlin of  the Southern District of New York granted a preliminary injunction after considering evidence of harm faced by putative class members in <u>Strouchler</u>. 891 F. Supp. 2d at 517. In <u>Strouchler</u>, elderly and disabled recipients of twenty-four hour split shift care, administered by the State of New York through the City of New York, brought a claim on behalf of themselves and  putative  class  members  seeking  a  preliminary  injunction  preventing

defendants from reducing or terminating split shift services without adequate notice and legitimate reasons. Id. at 507. When examining whether there was sufficient evidence of improper notices being sent to putative plaintiffs, Judge Scheindlin considered that

> on at least four occasions, the City [of New York] sent . . . recipients two notices issued on the same date, one reauthorizing and the other reducing or discontinuing their . . . services for the same reauthorization period. In other instances the City sent two notices on the same day or in close proximity to one another- one retroactively reauthorizing . . . care and the other prospectively reducing . . . care . . . . In addition, the City has issued a Spanish notice to an English-speaking recipient, an illegible notice, and a notice that was never received and perhaps never mailed. Finally, in many instances, the City has sent boilerplate notices to recipients stating that their benefits will be reduced because a mistake has occurred but failing to identify the alleged mistake.

Id. at 520 (multiple footnotes omitted). Judge Scheindlin also observed that "plaintiffs have produced evidence showing that at least three putative class members have not continued to receive aid pending" an appeal of their claims and that "administrative law judges ha[d] reversed the [defendant's] decisions [to reduce benefits] in over ninety-seven percent of the appeals brought by putative class members[,]" before concluding that "plaintiffs present[ed] significant evidence that many putative class members have not received legally sufficient notice." Id. at 518, 520-21.

In this case, plaintiffs claim that the irreparable harm faced by putative class members is that elderly individuals will not receive written notice of why their claim is being denied or "what their options are moving forward[;]" also, it will be "very difficult for an elderly insured to seek assistance from third-parties when there is no written basis for the claim denial." (Dkt. #18, Brief at 16)(emphasis omitted). Plaintiffs later elaborated that this harm also includes the possibility of putative class members "moving into an MRC and paying out of pocket expenses without understanding how or why [Continental] is denying

coverage, not knowing if they should move back home, hire an attorney, move to a skilled nursing facility, or sit tight and wait pending outcome of this litigation." (Dkt. #67, at 13).

Plaintiffs have not presented enough evidence, even under the more lenient standard set forth in <u>Textron</u>, to demonstrate that putative class members are suffering from irreparable harm as a result of not receiving written denials. Plaintiffs claim that "the Class is comprised of at least 400 individuals based in Connecticut, and at least 22,814 individuals nationwide with policy LTC 1 and at least 341 individuals based in Connecticut, and at least 16,817 individuals nationwide with policy form Con. Care B." (Dkt. #139, at 27). However, plaintiffs have provided only minimal evidence to show that these putative class members are not receiving written notices of denied claims.

Plaintiffs originally submitted the transcripts of nine phone calls between named plaintiffs, or their representatives, and defendant's representatives to show that written notices for denied claims are not being sent. (Dkt. #73). While the transcripts of these calls show that these specific plaintiffs placed multiple phone calls and had long and bothersome delays before receiving written denials and information about appealing the decision, the transcripts do not show that this problem was encountered by any putative class members.

Plaintiffs also submitted records of a conversation that took place on July 16, 2013 between plaintiffs' counsel and a claim representative during which they discussed why Gardner's claim for a stay at The Village was being denied. (Dkt. #73, Exh. K). Gardner was inquiring into this denial because Gardner and her husband had previously qualified to stay at The Village under the same policy. (<u>Id.</u>, Exh. K at 3). Defendant's representative explained that, despite the fact that Gardner had previously had a claim approved, due to a settlement agreement in the <u>Pavlov</u> matter, defendant was forced to reexamine all of its

previously approved claims. (Id., Exh. K at 3-8). During this reexamination, defendant claims to have discovered that some claims, like that of Gardner, had been approved in error and, having corrected this error after the reexamination, Gardner's second claim to the same facility was being denied. (Id. at 6-8). Gardner points out that when defendant's representative was asked if this issue was arising frequently or if it was isolated solely to Gardner's situation, she replied,

> I mean it's definitely not just her. I've had other people. I don't know how many, you know, across the board but I have – she's not the only one. I've dealt with other insurers where maybe they were on claim and then they were off for a couple of years and came back.

(Id., Exh. K at 13). She went on to say that she "ha[s] no idea how often it happens." (Id.). Despite plaintiffs' reliance on this call (Dkt. #73, at 9-10), it shows only that some policy holders who had previously been approved for a stay in a particular facility had later been denied at the same facility; it does not provide any information on whether or not a claim was opened and a written denial was sent to these policy holders.

Plaintiffs later filed a Second Supplemental Statement of Facts in Support of their Motion for Preliminary Injunction which they claim evidence of "at least three absent class members . . . receiv[ing] verbal claim denials." (Dkt. #91, at 2; see also Dkt. #90). Plaintiffs claim that "denial letters are only generated when a claim/RFB has been opened in [Continental's] system, and [Continental] does not want to open an RFB/claim, and a corresponding pending claim cash reserve for a claim that it (but not policy holders) know from the start it will deny." (Dkt. #67, at 6). However, the calls plaintiffs submit do not support this claim. The first of these phone calls occurred on August 24, 2010, and during the call the representative "[v]erified the mailing address on file and mailed the letter and claim forms[,]" as well as "[o]pened RFB with close date 10/08/2010[.]" (Dkt. #91, Exh. B).

One month later, the insured called to discontinue the claims process and the RFB was closed. (Dkt. #94, Exh. A). Similarly, the third call upon which plaintiffs rely, that occurred on May 6, 2010, also notes that the representative "[v]erified the mailing address on file and mailed the letter and claim forms to both the ins[ured] and spouse . . . should a claim need to be filed in the future[;]" however, he did not open the RFB at the time because the insured was "unsure if/when the admission would take place to the next level of the facility." (Dkt. #91, Exh. D at 3). A second call three years later to the same insured reflects that the representative "[e]xplained that the policy does not provide coverage while in independent living[]" but also that the representative would research whether a claim could be approved if the insured and his spouse moved into a different section of the same facility and would call the insured back when he had an answer. (Id., Exh. D at 4). This exhibit does not support plaintiffs' claim that defendant refused to open a claim or to issue a written claim denial; rather it appears that the insured called not to open a claim but to research the process if filing a claim became necessary. (Id. (Insured called "to go over the claim filing process and the requirements of the policy.")). Therefore, plaintiffs' Second Supplemental Statement of Facts in Support of their Motion for Preliminary Injunction includes only one example in which an insured called a claim representative and that representative chose not to open a claim, mail a claim form, or mail a letter of denial. (Id., Exh. C). This single example fails to meet even the more relaxed standard as set forth in Textron to show that putative class members are suffering from the irreparable harm that plaintiffs are alleging.

## 2.  LIKELIHOOD OF SUCCESS OR SERIOUS QUESTIONS THAT GO TO THE MERITS

In light of the conclusions reached above, there is no need to address these issues.

## II. CONCLUSION

For the reasons stated above, plaintiffs' Motion for Preliminary Injunction (Dkt. #18) is <u>denied without prejudice to renew if plaintiffs' Motion to Certify Class is granted</u>.

The parties are free to seek a district judge's review of this recommended ruling. <u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 8th day of January, 2016.


<u>/s/ Joan G. Margolis, USMJ</u>
Joan Glazer Margolis
U.S. Magistrate Judge

24