UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE ESTATE OF MARIE L. GARDNER, THE ESTATE OF FRANCIS R. COUGHLIN, M.D., THE ESTATE OF BARBARA B. COUGHLIN, JANICE B. FOSTER, and MARIE MILLER, Individually and on Behalf of All Others Similarly Situated, <br>     *Plaintiffs*, <br>     *v.* <br> CONTINENTAL CASUALTY COMPANY, <br>     *Defendant.* | Civil No. 3:13cv1918 (JBA) <br><br><br><br><br><br> March 1, 2016 |

**RULING ON MOTION FOR CLASS CERTIFICATION**

Plaintiffs the Estate of Marie L. Gardner, the Estate of Francis R. Coughlin, M.D., the Estate of Barbara B. Coughlin, Janice B. Foster, and Marie Miller bring this case against Defendant Continental Casualty Company ("CNA"), alleging violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a (Count One), unjust enrichment (Count Two), breach of contract (Count Three), and bad faith (Count Four), arising from Defendant's denial of insurance claims for Plaintiffs' stays in assisted living facilities in Connecticut. Plaintiffs now move [Doc. ## 108, 109] for class certification. Oral argument was held on February 24, 2016. For the following reasons, Plaintiffs' motion is granted.

Plaintiffs propose a Rule 23(b)(2) class and a Rule 23(b)(3) subclass. As revised at oral argument, Plaintiffs' proposed Rule 23(b)(2) class consists of all current CNA long-term care insurance policyholders of the following policy forms — 'LTC 1' (Forms 15203/16356/17931) and 'Con Care B' (Form 59433) who reside in Connecticut and whose policy was issued in Connecticut. The proposed Rule 23(b)(3) subclass consists of:

> All Class members who were medically eligible for benefits but were
> not afforded coverage for a stay at an assisted-living facility[1] in the
> State of Connecticut — on the grounds that the facility (1) was not
> licensed by the state and/or (2) could not legally provide 24-hour-a-
> day, or continuous, nursing services/care and who suffered
> ascertainable damages as a result.

(Mot. for Class Cert. at 2.)

In order to understand these class definitions, some background on the insurance

policies at issue and the Connecticut laws and regulations governing assisted living

facilities is necessary.

## I.    Background

### A.  Connecticut Laws & Regulations

Plaintiffs' claims arise out of Defendant's refusal to cover their stays in managed

residential communities ("MRCs") in Connecticut or to cover the services provided to

Plaintiffs through assisted living services agencies ("ALSAs").

Under Connecticut law, an MRC is a "for-profit or not-for-profit facility

consisting of private residential units that provides a managed group living environment

consisting of housing and services for persons who are primarily fifty-five years of age or

older." Conn. Gen. Stat. § 19a-693. MRCs must "[a]fford residents the ability to access

services provided by an [ALSA]." Conn. Gen. Stat. § 19a-694. ALSAs are regulated by the

Connecticut Department of Public Health.

---

[1] In their Second Revised Amended Complaint, Plaintiffs define an "assisted-living facility" as a managed residential community ("MRC") facility licensed as an assisted living services agency ("ALSA") or which contracts with a licensed ALSA in order to provide assisted living services to its residents. (*See* Second Revised Am. Compl. [Doc. # 139] ¶¶ 20, 21.)

Under the Department's regulations, an MRC "may not provide health services . . . unless it has been licensed as an assisted living services agency." Conn. Agencies Regs. § 19-3-D105(c)(6). An MRC may, however, "contract with one or more" ALSAs "to make available health services for tenants provided by such licensed persons or entities." *Id.* "Assisted living services may not be provided in a managed residential community unless . . . the assisted living services agency has been issued a license to operate by the department." *Id.* § 19-3-D105(c)(1).

ALSAs are required to employ a supervisor of assisted living services who must be "a registered nurse licensed to practice in this state," *id.* § 19-3-D105(g)(1), as well as at least one additional registered nurse, *id.* § 19-3-D105(j)(2). Supervisors must be on site at least twenty hours per week (forty if the ALSA employs more than ten full time or full time equivalent licensed nurses or assisted living aides). *Id.* § 19-3-D105(j)(3). Additionally, ALSAs are required to be staffed with other "licensed nurses at least ten . . . hours per week for each additional ten . . . or less full time or full time equivalent assisted living aides." *Id.* § 19-3-D105(j)(4). Finally, ALSAs must "designate a registered nurse to be on call twenty-four . . . hours a day." *Id.* § 19-3-D105(j)(8).

ALSAs are mandated to "maintain a complete service record for each client. All parts of the record pertinent to the daily care and treatment of the client shall be located in an accessible area on the campus of the managed residential community." *Id.* § 19-3-D105(k)(1). The record must contain "complete medical diagnoses," "all initial and subsequent orders by the physician or health care practitioner," "assessment of the client including pertinent past and current health history, physical,  mental and social status, and evaluation of client's needs," "nurses['] notes including changes in client conditions,"

3

"a record of medications administered," and "documentation of all care and services rendered." *Id.* § 19-3-D105(k)(2).

### B.   The LTC 1 and Con Care B Policies

Plaintiffs had one of two insurance policies: an LTC 1 policy or a Con Care B policy. In order to qualify for long term care benefits under either policy, claimants are required to demonstrate: (1) they are medically eligible and (2) the facility at which they will reside meets the definition of a Long-Term Care Facility ("LTCF"). (Second Revised Am. Compl. ¶ 15.)

#### 1.   Medically Eligible

Under the LTC 1 policy, a claimant is "medically eligible" if the care required and provided in the LTCF is "necessary care"[2]; "due to the inability to perform two or more activities of daily living"[3]; or "due to cognitive impairment." (LTC 1 Policy, Ex. A to Second Revised Am. Compl. at 6.) Under the Con Care B policy, a claimant is "medically

---

[2] "Necessary care" is defined as:

Care or services which are:
1. Provided for acute or chronic conditions; and
2. Consistent with accepted medical standards for your condition; and
3. Not designed primarily for the convenience of you or your family; and
4. Recommended by a physician who has no ownership in the [LTCF] in which you are receiving care.

(LTC 1 Policy at 6.)

[3] Activities of daily living include eating, dressing, taking medication, toileting, and mobility. (*Id.* at 7.)

eligible" if the Long Term Care[4] required is "necessary care."[5] (Con Care B Policy, Ex. B to Second Revised Am. Compl. at 6.)

### 2. Long-Term Care Facility

The LTC 1 policy defines an LTCF as:

A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1. Is licensed by the state where it is located; and
2. Provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and
3. Has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and
4. Keeps a daily medical record of each patient; and
5. May be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care . . . . However, care of services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision.

---

[4] Long Term Care includes "Skilled Care, Intermediate Care, or Custodial Care which is required as a result of a Loss of Functional Capacity." (Con Care B Policy at 5.) "Skilled Care" means "care for injury or sickness" which requires the training and skills of a licensed professional nurse, "Intermediate Care" means technical nursing care (of a lesser degree than that required for skilled care), and "Custodial Care" means care which is mainly for the purpose of meeting daily living requirements. (*Id.* at 4–5.)

[5] "Necessary care" means: "admitted upon recommendation of a physician . . . for care which is 1) medically necessary; and 2) not at first custodial in nature but may, after admission, be reduced to a level that is primarily custodial." (*Id.* at 5.) However, some policies include a "Necessary Care Redefinition Rider," redefining "necessary care" to mean: "admitted upon recommendation of a physician . . . for care which is medically necessary." (*Id.* at 10)

(LTC 1 Policy at 8.)

The Con Care B policy, by contrast, defines an LTCF as "a skilled nursing facility or a custodial or an intermediate care facility." (Con Care B Policy at 4.) A "skilled nursing facility" is, in turn, defined as a place which:

1. is licensed by the State;
2. provides skilled nursing care under the supervision of a physician;
3. has 24-hour-a-day nursing services by or under the supervision of a registered nurse (RN); and
4. keeps a daily medical record of each patient.

(*Id.*) A "custodial or intermediate care facility" is a place which:

1. is licensed by the State;
2. operates primarily to provide nursing care for three or more persons at those persons['] expense; and
3. provides continuous nursing care under the direction of a licensed registered nurse (RN), a licensed practical or vocational nurse (LPN or LVN) or a physician.

It is not a hospital or clinic; a home for the aged or mentally ill; a rest home; a community living center; or a place that provides domiciliary, residency, or retirement care . . . .

(*Id.*)

### C.  The Named Plaintiffs

#### 1.  Marie L. Gardner

Ms. Gardner purchased an LTC 1 policy from CNA on October 25, 1993. (Second Revised Am. Compl. ¶ 22.) In 2008, after she broke her hip, Ms. Gardner began to need assistance with activities of daily living. (*Id.* ¶ 23.) In order to obtain that assistance, she moved to the assisted living facility "The Village" in South Windsor, Connecticut, and filed a long term care claim with CNA to cover the cost of her stay there. (*Id.*) Her claim was approved on October 20, 2008, with an effective date of June 10, 2008. (*Id.* ¶ 24.) On

February 11, 2011, CNA terminated Ms. Gardner's claim because her medical condition had improved.[6] (*Id.* ¶ 25.) However, Ms. Gardner decided to stay at The Village and began paying for her own stay there. (*Id.* ¶ 26.)

On April 28, 2012, Ms. Gardner fell down a flight of stairs and fractured her sacrum. (*Id.* ¶ 27.) Thereafter, on May 8, 2012, she filed a claim for benefits with CNA to once again cover her stay at The Village. (*Id.*) However, on July 10, 2012, CNA denied her claim on the grounds that the facility was not licensed. (*Id.* ¶ 28; *see* Gardner Explanation of Benefits, Ex. D to Second Revised Am. Compl.)

When Ms. Gardner's counsel wrote to CNA in October 2012 seeking an explanation for the denial of Ms. Gardner's claim, CNA's counsel responded:

> The primary basis for the denial of benefits for Ms. Gardner was (and remains) the fact that The Village is not a licensed facility . . . . The State of Connecticut licenses facilities providing skilled or intermediate nursing care. . . . The Village is not a licensed facility. Rather, it is a managed residential community (MRC) which is not licensed by the state of Connecticut. . . . [R]esidents of an MRC may receive assisted living services through an assisted living services agency (ALSA). The ALSA must be licensed through the state, and it is our understanding that The Village is a licensed ALSA. The facility itself, however, is not licensed.
>
> You should be aware that in light of policy requirements that long-term care facilities be licensed, [CNA] has worked with the State of Connecticut Insurance Department to address MRCs at which ALSA services are provided. [CNA] has agreed with the Insurance Department that there are circumstances under which a long-term care policyholder might receive benefits related to services provided by an ALSA while the insured is a resident of an MRC. For example, benefits might be available where a policy provides coverage for home health care services or where the policy affords "Alternate Care Facility" (ACF) coverage. . . .

---

[6] This termination of benefits is not at issue in this case.

7

> Regardless of the "nursing services" requirement within the definition of Long Term Care Facility . . . and regardless of whether the requisite services are available at The Village, it cannot be disputed that The Village is not a facility licensed by the State of Connecticut. As such, it cannot qualify as a Long-Term Care Facility for purposes of the [CNA] policy, and Ms. Gardner's residence at The Village cannot qualify for benefits under the policy.

(Nov. 26, 2012 Gardner Ltr., Ex. F to Second Revised Am. Compl.)

On February 22, 2013, CNA sent Ms. Gardner a second letter explaining its refusal to approve Ms. Gardner's claim for benefits. In that letter, CNA wrote:

> Village at Buckland Court is a "Managed Residential Community" ("MRC") which provides residents with private apartment residences. It is not a facility providing Long Term Care to its residents, and is not licensed by the State of Connecticut to provide such care. It does not provide skilled, intermediate, or custodial nursing care under the supervision of a physician or have 24-hour-a-day nursing services provided by or under the supervision of a registered or licensed nurse. Finally, it does not keep a daily medical record of each patient. . . .
>
> . . . Village at Buckland Court residents may receive assisted living (not nursing) services through . . . BAL Windsor, a licensed ALSA. . . . Even if BAL Windsor ALSA services were considered for purposes of Long Term Care Facility Benefit coverage — and they should not be, as Village at Buckland Court is the "facility" for purposes of this benefit — those services still would be insufficient to qualify for the coverage. . . . BAL Windsor ALSA may provide assisted living or personal care services, but it does not provide the continuous nursing services or the physician supervision of nursing care required under the Policy's Long Term Care Facility requirements. In addition, BAL Windsor does not "maintain a daily medical record for each patient," as required by the policy. Rather, BAL Windsor maintains such records only for those residents who elect to purchase ALSA services.

(Feb. 22, 2013 Gardner Ltr., Ex. G to Second Revised Am. Compl.)

On July 26, 2015, Ms. Gardner passed away. (Second Revised Am. Compl. ¶ 42.)

### 2.   Francis B. Coughlin and Barbara B. Coughlin

The Coughlins purchased an LTC 1 policy from CNA on December 5, 1992. (*Id.* ¶ 43.) In April 2012, they moved to Atria Darien, an assisted living facility located in Darien, Connecticut. (*Id.* ¶ 44.) Dr. Francis Coughlin was suffering from "multiple ailments" and Ms. Barbara Coughlin had Alzheimer's disease. (*Id.*) The Coughlins filed a claim for benefits with CNA, but on May 16, 2012, their claim was denied on the basis that although they had "qualifying impairment[s]," Atria Darien "did not meet the policy requirements as a Long Term Care Facility." (*Id.* ¶ 45; May 16, 2012 Coughlin Ltr., Ex. H to Second Revised Am. Compl.) CNA explained that "Atria Darien is a Managed Residential Community ('MRC')" and "[a]n MRC does not meet the requirements of the policy as a Long-Term Care Facility" because "it is not licensed by the state, does not provide skilled nursing care under the supervision of a physician and does not have 24-hour-a-day nursing services by or under the supervision of a registered nurse (RN), licensed vocational nurse (LVN), or licensed practical nurse (LPN)." (Second Revised Am. Compl. ¶ 45; May 16, 2012 Coughlin Ltr.)

On June 29, 2012, the Coughlins appealed CNA's decision, but CNA upheld its determination on August 14, 2012 for substantially the same reasons it gave to Ms. Gardner for her denial. (*See* Aug. 14, 2012 Coughlin Ltr., Ex. J to Second Revised Am. Compl.) As with Ms. Gardner, CNA additionally denied the Coughlins' claim for benefits under their APC provisions. (*See id.*)

Dr. Coughlin "subsequently returned to his home and began paying for at-home nursing care out of pocket." (Second Revised Am. Compl. ¶ 48.) In January 2013, Ms. Coughlin moved to Waveny, a "licensed assisted living facility" which "provides nursing

care (skilled intermediate and/or custodial) under the supervision of a physician and does have 24 hour a day nursing services available to all residents under the supervision of a licensed nurse and meets the definition of a Long Term Care Facility under the terms of the LTC 1 policy." (*Id.* ¶ 52.)

The Coughlins' attorney, John Hetherington, called CNA on May 9, 2013 to initiate a claim for Ms. Coughlin's stay at Waveny. (*Id.* ¶ 50.) CNA responded on May 15, 2013, notifying him that Ms. Coughlin's care would not be covered. (*Id.* ¶ 51.) Mr. Hetherington requested written claim forms from CNA on June 4 and June 19, 2013, without success, and on August 1, 2013, CNA informed him that the Coughlins' claim had actually been closed as of July 1, 2013, although no one from CNA had contacted Waveny. (*Id.* ¶¶ 53–54.) CNA promised to reopen the claim. (*Id.* ¶ 54.) Having heard nothing back from CNA, on August 22, 2013, Mr. Hetherington called CNA again and was told that Ms. Coughlin's claim was under review and a decision would be made within 45 days of August 1, 2013. (*Id.* ¶ 55.) As of November 1, 2013, Waveny still had not been contacted by CNA and no decision had been communicated by CNA to the Coughlins. (*Id.* ¶ 55.)

On January 3, 2014, the State of Connecticut's Office of the Healthcare Advocate ("OHA") called CNA on behalf of Ms. Coughlin to determine the status of Ms. Coughlin's claim. (*Id.* ¶ 56.) CNA informed her that no claim had been initiated for Ms. Coughlin because when a claimant calls to initiate a claim, "it is evaluated as to whether it qualifies or not to be a claim. This request did not [because] . . . the caller was informed the facility was not eligible or covered under the policy. . . . [I]f no official claim is

opened," CNA's system "does not generate a client letter" with a written determination. (OHA Ltr., Ex. K to Second Revised Am. Compl.)

On February 21, 2014, Dr. Coughlin passed away. (Second Revised Am. Compl. ¶ 58.) On March 29, 2015, Ms. Coughlin passed away. (*Id.* ¶ 59.)

### 3. Janice Foster

On August 1, 1992, Ms. Foster purchased an LTC 1 policy from CNA. (*Id.* ¶ 60.) "Due to cognitive decline and the need [for] assistance with activities of daily living, on November 12, 2013 Ms. Foster entered the skilled nursing home McLean Health Center." (*Id.* ¶ 61.) On November 25, 2013, she moved to Atwater at McLean, the assisted living memory care unit on the same property. (*Id.*) Ms. Foster filed a claim with CNA for the cost of the facility, but CNA denied her claim on February 13, 2014. (*Id.* ¶ 62.)

Although "CNA does not dispute that Ms. Foster meets the medical eligibility requirements under the LTC 1 policy" (*id.* ¶ 64.), CNA denied her claim for the same reasons it denied Ms. Gardner and the Coughlins' claims (Feb. 13, 2014 Foster Ltr., Ex. L to Second Revised Am. Compl.). In a letter dated February 21, 2014, CNA explained that McLean Health Center – MRC is not licensed to provide Long-Term Care by the state of Connecticut," and does not "provide the type of nursing care and 24-hour-a-day nursing services, or keep daily medical records, all as required under the Long-Term Care Facility definition in your policy." (Second Revised Am. Compl. ¶ 65; *see* Feb. 21, 2014 Foster Ltr., Ex. M to Second Revised Am. Compl.) Although CNA did agree to cover some of the facility's costs under Ms. Foster's Home Health Care Rider, the benefits provided under that provision "are far less than the benefits available . . . under the terms of the LTC 1

policy's Long Term Care Facility benefit in part because they do not cover room and board." (Second Revised Am. Compl. ¶ 66.)

### 4. Marie Miller

Ms. Miller purchased a Con Care B policy from CNA on September 1, 1991. (*Id.* ¶ 68.) In 2011, Ms. Miller's daughter contacted CNA to inquire about whether the assisted living facility Maple Woods located in Hamden, Connecticut would be covered by Ms. Miller's policy and was told "multiple times by separate CNA representatives" that it would be. (*Id.* ¶ 70.) Based on these representations, Ms. Miller, who was suffering from progressive dementia, moved into Maple Woods, and in May 2011, she filed a claim with CNA for coverage. (*Id.* ¶¶ 69, 71.) "Shortly thereafter, CNA called Ms. Miller's daughter and stated that a mistake had been made and Maple Woods would not be covered." (*Id.* ¶ 72.) In letters dated May 23, 2011 and July 21, 2011, CNA explained that Maple Woods did not "meet the policy requirements as a Skilled Nursing Facility as it does not provide 24-hour-a-day nursing services by or under the supervision of a registered nurse" (May 23, 2011 Miller Ltr., Ex. M to Second Revised Am. Compl.), and CNA had not received a Provider's Statement verifying Ms. Miller's medical eligibility (July 21, 2011 Miller Ltr., Ex. O to Second Revised Am. Compl.).

In July 2011, Ms. Miller inquired about whether CNA would cover the dementia and Alzheimer's assisted living facility Arden Courts of Hamden. (Second Revised Am. Compl. ¶ 74.) For the same reasons it denied her initial claim, CNA informed Ms. Miller it would not cover her stay at Arden Courts. (*Id.*)

"Given the need for care and her inability to afford paying for care at an assisted living facility out of pocket, Ms. Miller reluctantly moved to a substantially more

expensive skilled nursing home so that CNA would pay her claim." (*Id.* ¶ 78.) ". . . CNA's current benefit payment to Ms. Miller does not cover the full amount of monthly charges from the skilled nursing home." (*Id.*)

### D.  The *Pavlov* Settlement

Prior to the filing of this case, four of the five named Plaintiffs were members of a settlement class in a case captioned *Pavlov v. Continental Casualty Company*, No. 07-2580 (N.D. Ohio). The plaintiffs in that case each owned a version of the LTC 1 policy and had sought coverage for stays at long term care facilities but were denied coverage on the grounds that the facilities did not provide nursing services that satisfied policy requirements. *See id.*, Stip. of Settlement [Doc. # 93-2] at 1–2. The plaintiffs challenged CNA's determination that the facilities did not provide 24-hour-a-day nursing services. *Id.* at 2.

The Court approved two settlement classes. *See id.*, Mem. Opinion [Doc. # 107]. Class I was a Rule 23(b)(3) class comprising individuals "who own or owned an individual Long Term Care 1 series policy," "who submitted a claim between May 24, 2003 and the Settlement Date for benefits for a stay at a care facility," "whose claim was denied because there was a Registered Nurse, Licensed Vocational Nurse, or Licensed Practical Nurse on staff (or providing service through an outside vendor), but was not on-site 24-hours-a-day" and "whose claim was not deniable on any other basis." *Id.* at 3. Class II, a Rule 23(b)(2) class, included "all persons who have an in-force Policy." *Id.* "Settlement Class II members" were to "receive the benefit of a less restrictive interpretation of the nursing requirement." *Id.* at 4. Specifically, CNA agreed that the 24-

hour-a-day nursing requirement would be deemed satisfied if an RN, LVN, or LPN was on-site "no less than 5 hours a day, 7 days a week." *Id.*

## II.     Legal Standard

A party seeking class certification under Federal Rule of Civil Procedure 23 "'must affirmatively demonstrate . . . compliance with the Rule,' and a district court may only certify a class if it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)).

"Generally, there are two steps that a district court must take when considering a motion for class certification pursuant to Rule 23." *Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 100 (E.D.N.Y. 2014). Preliminarily, the court must ensure that: "(1) the class is so numerous that joinder of all members is impracticable;" "(2) there are questions of law or fact common to the class;" "(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and "(4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Once a court has concluded that Rule 23(a)'s four requirements have been satisfied, it must then proceed to the second step, i.e., determine 'whether the class is maintainable pursuant to one of the subsections of Rule 23(b).'" *Goodman*, 300 F.R.D. at 101 (quoting *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007)). As relevant here, Rule 23(b) permits the certification of a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2); or where the court finds that the questions of law or fact

common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, Fed. R. Civ. P. 23(b)(3).[7]

### III.    Discussion[8]

Plaintiffs here contend that following the *Pavlov* settlement, "CNA concocted different ways to increase claim denials and terminations." (Second Revised Am. Compl. ¶ 81.) One of those approaches was to develop a new policy interpretation of the LTC 1 and Con Care B policies under which "CNA denies new claims for stays at assisted living facilities," even if "a previous claim had been paid at an assisted living facility as is the case with Ms. Gardner"[9] without informing any policyholders of the changed policy interpretation. (*Id.*  ¶¶  82–83.) Plaintiffs charge that "Defendant's new policy interpretation has been made very clear: due to the licensing structure of assisted living facilities in Connecticut, the policies do not cover stays at any assisted living facilities in the State." (*Id.* ¶ 84.) According to Plaintiffs, the uniformity of the policy makes this case appropriate for class certification.

Because Plaintiffs have proposed a class and a subclass, the Court must examine "each [group] and its respective representative" to ensure they "independently meet the

---

[7] Plaintiffs do not seek certification of the class under Rule 23(b)(1).

[8] Arguments pertaining to parts of the class definition that were altered at oral argument are omitted.

[9] Plaintiffs note however that "CNA does not terminate claims of policyholders residing at assisted living facilities who were on claim at the time CNA changed its policy interpretations to exclude Connecticut assisted living facilities." (Second Revised Am. Compl. ¶ 82.)

requirements for maintenance of a class action." *Burka v. New York City Transit Auth.*, 110 F.R.D. 595, 601 (S.D.N.Y. 1986) (internal quotation marks omitted); *Warren v. Xerox Corp.*, No. 01-CV-2909 (JG), 2004 WL 1562884, at *17 (E.D.N.Y. Jan. 26, 2004) (same).

## A. Prerequisites under Rule 23(a)

### 1. Ascertainability

The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24–25 (internal quotation marks omitted).

#### a. The Rule 23(b)(2) Class

Defendant maintains that Plaintiffs' main class of all current LTC 1 and Con Care B policyholders is "impermissibly overbroad" because it "includes policyholders who have not made, and never will make, an MRC claim" and "policyholders who may have bought and then cancelled a policy without ever hearing of an MRC." (Opp'n Mot. for Class Cert. [Doc. ## 126, 127] at 26.) As a result, "[t]he proposed main class does not have just *some* members without standing—the vast majority lack standing." (*Id.* at 26–27.)

"The Second Circuit has cautioned against certifying overbroad classes, even under Rule 23(b)(2), which requires a less precise definition than Rule 23(b)(3)," *M.G. v. New York City Dep't of Educ.*, No. 13-CV-4639 (SAS), 2016 WL 54687, at *8 (S.D.N.Y. Jan. 4, 2016), noting that "an over-broad framing of the class may be so unfair to the absent members as to approach, if not amount to, deprivation of due process," *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1337 (2d Cir. 1992) *cert. granted,*

16

*judgment vacated sub nom. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993). Relatedly, the Second Circuit, while not "requir[ing] that each member of a class submit evidence of personal standing,"[10] has admonished district courts not to certify any class "that contains members lacking Article III standing."[11] *Denney v. Deutche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). Thus, "[t]he class must . . . be defined in such a way that anyone within it would have standing." *Id.*

That is the case here. Every current policyholder purchased long-term care insurance with the expectation that at some point in the future she would need to utilize it. She may not know exactly when she will need the insurance, but she can be fairly certain that at some point she will need it, and when she does, she will be faced with a policy interpretation that severely limits her options for long-term care.[12] These

---

[10] "To have Article III standing, a plaintiff must satisfactorily allege: (1) a concrete, particularized, and 'actual or imminent' injury; (2) 'a causal connection between the injury and the conduct complained of'; and (3) a 'likel[ihood] . . . that the injury will be redressed by a favorable decision' of the court." *Janes v. Triborough Bridge & Tunnel Auth.*, 889 F. Supp. 2d 264, 465 (S.D.N.Y. 2012) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). "Where, as here, a plaintiff seeks injunctive relief, that plaintiff must adequately allege that he or she is presently 'under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.'" *Id.* at 465–66 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009)).

[11] Whether all class members or only class representatives must have standing is the subject of a circuit split.

[12] Defendant asserted at oral argument that Plaintiffs could not have had an expectation that their policies would cover MRC/ALSAs when they purchased them because the marketing materials for the policies refer exclusively to nursing facilities. However, a review of the marketing materials demonstrates that they, like the policies

individuals, therefore, have standing to challenge Defendant's interpretation of their policies. Plaintiffs' revisions to the class definition—limiting it to current policyholders rather than former and current, and limiting it to Connecticut residents who purchased their policies in Connecticut—eliminate any problems of overbreadth that might otherwise have existed.

### b.   Rule 23(b)(3) Subclass

Defendant asserts that the proposed subclass is not ascertainable for two reasons: (1) "the term 'assisted-living facility' . . . is not a defined term under Connecticut law"; and (2) "[e]stablishing that someone resided in an MRC, either today or in the past, requires individual investigation," as does determining whether someone received care from an ALSA. (Opp'n at 28.)

Although Plaintiffs do define an "assisted living facility" in their Second Revised Amended Complaint as an MRC licensed as an ALSA or which contracts with a licensed ALSA (*see* Second Revised Am. Compl. ¶ 20), the class definition could be more precise; as Defendant notes, the term "assisted living facility" is not used in Connecticut. However, if the classes were redefined to refer to MRC/ALSAs, such a definition would easily lend itself to ascertainability, as the criteria for membership in the class are both

---

themselves, are ambiguous about what they cover. (*See* Exs. B–G to Opp'n.) Although they reference "nursing homes" and "nursing home facilities," they also state that the plans cover "long term care," which the State of Connecticut defines to include care in managed residential facilities. *See* Conn. Dep't of Public Health, *Statewide Healthcare Facilities and Service Plan: October 2012*, at 71, *available at* http://www.ct.gov/dph/lib/dph/ohca/publications/2012/ohcastatewide_facilities_and_ser vices.pdf. Ultimately, this is an issue that goes to the merits of Plaintiffs' claim, and as such, it will be left for another day.

objective and administratively feasible. The absence of the "medically eligible" requirement in the APC subclass does not appear relevant to ascertainability.

For purposes of clarity, as explained above, the subclass is redefined as follows:

> All Class members: (1) who were residing in a managed residential community ("MRC") and (2) receiving care from an assisted living services agency ("ALSA") (3) in the State of Connecticut; (4) who were medically eligible for benefits; (5) but were not afforded coverage for the costs of the MRC and ALSA; (6) on the grounds that the facility (a) was not licensed by the state and/or (b) could not legally provide 24-hour-a-day, or continuous, nursing services/care and (7) who suffered ascertainable damages as a result.

### 2.   Numerosity

For a proposed class to pass muster under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'Impracticable,' in this context, does not mean impossible; instead Rule 23(a)(1) only requires that in the absence of a class action, joinder would be 'simply difficult or inconvenient.'" *Assif v. Titleserv, Inc.*, 288 F.R.D. 18, 23 (E.D.N.Y. 2012) (quoting *Russo v. CVS Pharm., Inc.*, 201 F.R.D. 291, 294 (D. Conn. 2001)).

Although "[t]here is no magic minimum number that will breathe life into a class," *id.*, "[t]he numerosity requirement of Rule 23(a)(1) is presumed satisfied for classes with more than forty members," *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014). Nonetheless, "[d]etermination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Robidoux v. Celani*, 897 F.2d 931, 936 (2d Cir. 1993). Especially "when a class is not obviously numerous, the Court should consider the following factors: 'judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of

19

class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members.'" *Assif*, 288 F.R.D. at 23 (quoting *Robidoux*, 897 F.2d at 936).

Defendant does not argue that the main proposed class fails to satisfy numerosity, nor could it given that there are at least 741 LTC 1 and Con Care B policyholders who reside within the State of Connecticut, making joinder clearly impracticable. (*See* Mot. for Class Cert. at 9; Reply [Doc. # 156] at 7.) Plaintiffs have, therefore satisfied Rule 23(a)(1) with respect to the main proposed class. Numerosity for the proposed subclass is less clear-cut.

Plaintiffs claim that the proposed subclass satisfies numerosity because "discovery to date has identified at least [26[13]] individual class members (including the five named plaintiffs) in Connecticut who have had their LTCF benefit claims denied for stays at Connecticut assisted living facilities on identical grounds," and "[t]he actual number will be higher because: (1) this figure was calculated as of early 2015 . . .; and ([2]) the figure does not include at least three verbal claim denials identified during discovery." (Reply at 7.) Further, Plaintiffs argue, there are other factors here which make joinder impracticable, including "the ability of the deceased, elderly, and ailing individuals to pursue significant and expensive litigation against a large and well-capitalized insurance giant." (Reply at 8.)

Defendant, for its part, contends that: (1) the proposed subclasses are not, on their face sufficiently numerous; (2) Plaintiffs' figure of 26 denials is likely too high because it

---

[13] Plaintiffs claimed 22 individuals in the briefing but gave an updated figure of 26 at oral argument.

includes policyholders who may not have been medically eligible for coverage; (3) "'verbal claim denials' do not constitute 'denials' at all"; (4) "there is little risk of multiplicity of actions" in this case because "[t]he number of potential claim denials is small and none of those individuals has filed suit"; and (5) "[P]laintiffs have made no showing that the class members' financial resources would prevent them from bringing individual suits." (Opp'n at 29–30.)

The Court disagrees. Plaintiffs have shown that the subclass will consist of at least 29 individuals (including those who received verbal claim denials) and likely more. Further, while Plaintiffs have not put forth any evidence of financial barriers to filing individual claims, many of the class members are likely to be elderly and of limited capacity, making it difficult for them to file individual suits. Forcing the more than 29 elderly and ailing individuals in this proposed subclass "to separately pursue [their claims] . . . cannot be justified practically or economically." *Allen v. Isaac*, 99 F.R.D. 45, 53 (N.D. Ill.) amended, 100 F.R.D. 373 (N.D. Ill. 1983); *see Chambery v. Tuxedo Junction Inc.*, 10 F. Supp. 3d 415, 420 (W.D.N.Y. 2014) ("[C]ourts have not hesitated to certify subclasses with fewer than 40 members where joinder would be impracticable due to geographic dispersion or other factors."). Therefore, the Court finds the proposed class sufficiently numerous to satisfy Rule 23(a)(1).

### 3. Commonality/Typicality

Because the "commonality and typicality requirements often tend to merge into one another, so that similar considerations animate analysis of both," *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (internal quotation marks omitted), the Court will consider them together. "The crux of both requirements is to ensure that the maintenance of a

class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotation marks omitted); *see Dukes*, 131 S.Ct. at 2551 n.5 (same).

"To satisfy the commonality requirement, class members' claims must 'depend upon a common contention,' and the common contention 'must be of such a nature that it is capable of classwide resolution.'" *Vincent*, 304 F.R.D. at 453–54 (quoting *Dukes*, 131 S.Ct. at 2551). "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks omitted). "[W]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.'" *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45–46 (S.D.N.Y. 2013) (quoting *Robidoux*, 987 F.2d at 936–37).

Plaintiffs' argument with respect to both the main proposed class and the proposed subclass essentially boils down to this: whatever the minor differences in circumstances among the class members, all members of both classes hold one of two identically worded insurance policies and all members of both classes have been or likely will be subjected to the same improper interpretation of that policy by Defendant, across the board, regardless of the claimant's medical eligibility or other circumstances. (*See* Mot. for Class Cert. at 10–13; Reply at 10–11.) Because all of Plaintiffs' claims arise out

22

that interpretation and do not depend on circumstances specific to individual class members, Plaintiffs' claims all "derive from the same legal theories . . . and involve the same set of operative facts." (Mot. for Class Cert. at 13.) Moreover, there are several questions of fact or law common to the class that can "generate answers apt to drive the resolution of the litigation" and that are "of such a nature that [they are] capable of class resolution." (*Id.* at 10 (quoting *Dukes*, 131 S.Ct. at 2551).) These include:

(1) whether CNA issued long-term care policies of insurance to Plaintiffs and the Class

(2) whether a facility must be legally capable of providing 24/7 licensed nursing care to a particular resident in order for the facility to ever qualify for coverage as an LTCF;

(3) whether the policies' "licensed by the state" requirement is met by Connecticut assisted-living facilities operating legally within the State; . . .[14]

(5) whether Defendant breached its policies of insurance with Plaintiffs and the Class;

(6) whether Defendant's failure to pay claims under the policies was in bad faith and

(7) whether Defendant's conduct violated Conn. Gen. Stat. § 38a-815 ("CUIPA") and Conn. Gen. Stat. §§ 42-110b(a) and 42-110g(a-b) ("CUTPA").

(Mot. for Class Cert. at 10–11.)

Defendant responds that a finding of commonality and typicality is not warranted with respect to either the proposed main class or the proposed subclass because: (1) some of the policies, such as Ms. Miller's, include unique definitions of medical eligibility (Opp'n at 31); (2) whether a particular facility qualifies for coverage will turn on individualized evidence regarding the types of services offered; the nature, amount, and

---

[14] Number four, which concerns a withdrawn proposed subclass, has been omitted.

frequency of nursing care provided; the supervision of nurses; and the keeping of daily medical records (*see id.* at 32–37); (3) there are a number of individualized causation-related issues (such as Ms. Gardner's claim that she would not have moved into a nursing home had her claim not been denied) (*id.* at 37–38); (4) individualized inquiry will be necessary for verbal claim denials (*id.* at 38); (5) the plaintiffs will be subject to a number of individualized defenses with respect to the statute of limitations (CUTPA provides for a shorter statute of limitations than do Plaintiffs' other claims), offsets for claims mistakenly approved, and deceased policyholders (*id.* at 44); (6) bad faith, unjust enrichment, and CUTPA claims require highly fact-intensive inquiries and are not amenable to class treatment (*id.* at 42–43); and (7) non-party testimony will be needed (*id.* at 44).[15]

These are, however, not persuasive reasons to find a lack of commonality and typicality. As Plaintiffs note, the heart of these claims is a dispute over the proper interpretation of identically worded policies. In such cases, courts have often found that the commonality and typicality requirements were satisfied because the "named plaintiff share[d] at least one question of fact or law with the grievance of the prospective class," "the harm complained of [wa]s common to the class," and "[b]oth [the] plaintiff and the members of the putative class . . . were subject to the same course of conduct by [the] defendant that [gave] rise to claims . . . based on the same legal theory." *Meyer v. CUNA Mut. Grp.*, No. Civ.A. 03-603, 2006 WL 197122, at \*17, \*19 (W.D. Pa. Jan. 25, 2006); *see, e.g.*, *Landers v. Leavitt*, 232 F.R.D. 42, 47 (D. Conn. 2005) (certifying class of Medicare

---

[15] Defendant's concerns regarding choice-of-law issues have been addressed by Plaintiffs' revised class definitions provided at oral argument.

beneficiaries who were denied coverage for stays in a skilled nursing facility on the basis of the Secretary of the Department of Health and Human Services' interpretation of a governing regulation); *Churchill v. Cigna Corp.*, No. 10-6911, 2011 WL 3563489, at *4 (E.D. Pa. Aug. 12, 2011) (finding commonality satisfied where "the central question . . . [wa]s whether Cigna's denial of medical coverage . . . on the basis that [a particular] treatment [wa]s investigative or experimental was proper" because "the answer to this question [would] resolve each class member's individual claim"); *Meyer*, 2006 WL 197122, at *19 (certifying class where class members had all purchased disability insurance from CUNA Mutual Group and were denied coverage for claims based upon the defendant's interpretation of the definition of "total disability" in the policy).

To the extent that there are some individualized issues (and there do not appear to be quite so many as Defendant believes[16]) pertaining to medical eligibility or verbal denials, they can be handled at the claims administration stage if Plaintiffs prevail in their lawsuit. "Differing factual circumstances do not preclude a finding of commonality where, as here, the alleged injuries of the class members derive from a unitary course of conduct alleged to have caused the plaintiffs' injuries." *Ramirez*, 39 F. Supp. 3d at 371*; see McNeill v. New York City Hous. Auth.*, 719 F. Supp. 233, 252 (S.D.N.Y. 1989) ("The claims of all proposed class members derive from the same NYCHA policies and procedures, and are based on the same legal theories. Accordingly, the Court finds that there is sufficient commonality to satisfy Rule 23(a)(2)."). Moreover, contrary to Defendant's

---

[16] By law, every ALSA must provide continuous nursing care (at least as it is defined in *Pavlov*), obtain a state license, and maintain records for every patient. Whether the nurses are supervised by a physician and whether the medical records are kept on a daily basis can be readily determined at the claims administration stage.

belief, there is nothing inherently individualized about claims of bad faith, unjust enrichment, and unfair trade practices where the allegations stem from a policy Defendant instituted across the board.

Further, while "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation," *Ramirez*, 39 F. Supp. 3d at 362 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)), Defendant has not shown that to be the case here. *See Floyd v. City of New York*, 283 F.R.D. 153, 176 (S.D.N.Y. 2012) ("The doctrine of unique defenses is intended to protect absent members of the plaintiff class by ensuring the presence of a typical plaintiff. The doctrine is not meant to protect defendants by permitting them to defeat certification because the facts raised by the claims of the representative plaintiffs are not *identical* to the facts raised by the claims of all putative class members."); *Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 97 (S.D.N.Y. 2010) ("The unique defense rule . . . is not rigidly applied in this Circuit, and is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit." (internal quotation marks omitted)).

Defendant's argument with regard to non-party testimony is perplexing, as the Court is aware of no authority for the proposition that the need for non-party testimony is cause for denying class certification. Indeed, the cases Defendant cites in support of this proposition (*see* Opp'n at 45 n.29) are cases in which certification was denied due in part to the existence of *claims* against third parties, which is not at issue here.

Because Plaintiffs have shown that class members' claims depend upon a common contention (namely, whether CNA's policy of denying claims for MRC/ALSAs constitutes

a breach of contract, bad faith, or an unfair trade practice) which is of such a nature that it is capable of classwide resolution, and because each class member's claim rests on similar legal theories and arises from the same course of events, the Court finds that Plaintiffs have demonstrated commonality and typicality.

### 4.   Fair and Adequate Representation

The final prerequisite Plaintiffs must satisfy under Rule 23(a) is Rule 23(a)(4). "Adequacy under Rule 23(a)(4) consists of two requirements: 'First, class counsel must be qualified, experienced and generally able to conduct the litigation. Second, the class members must not have interests that are antagonistic to one another.'" *Vincent*, 304 F.R.D. at 456 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)).

Defendant makes no claim that class counsel is not qualified, experienced, and generally able to conduct the litigation, and the Court agrees. With respect to the second prong, however, Defendant raises three arguments: (1) class representatives will be subject to individualized defenses; (2) deceased plaintiffs cannot represent living plaintiffs in an action for forward-looking declaratory or injunctive relief; and (3) as argued at oral argument, neither of the living named Plaintiffs—Ms. Miller and Ms. Foster[17]—has standing to represent an injunctive class.

The first of these arguments should be rejected for the reasons discussed with respect to commonality and typicality above. The second is meritorious, as Plaintiffs

---

[17] Ms. Foster has an LTC 1 policy and Ms. Miller has a Con Care B policy.

conceded at oral argument. While the estates of deceased plaintiffs may have an interest in obtaining monetary damages, they have no interest in forward-looking relief.

Defendant's third argument requires some discussion. Defendant contends that: (1) neither of the living Plaintiffs is imminently threatened with injury (they have an adequate remedy at law), and therefore neither has standing to seek injunctive relief; (2) Ms. Miller lacks standing because she is not medically eligible to stay in an MRC/ALSA; and (3) Ms. Miller lacks standing because she has "maxxed out" her policy benefits and therefore would not benefit from injunctive relief.

### a. Imminent Injury

"It is well-established that '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Janes*, 889 F. Supp. 2d at 465 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "Rather, to have standing to seek forward-looking injunctive or declarative relief to prevent an alleged wrong, a plaintiff must show that he is 'realistically threatened' with recurrence of this wrong." *Id.* (quoting *Lyons*, 461 U.S. at 106).

The Court does not agree with Defendant's characterization of Ms. Miller and Ms. Foster as having an adequate remedy at law. As long as they need MRC/ALSA care and CNA denies coverage for such care, their injury continues and damages for a past denial do nothing to remedy their ongoing injury. It is of no moment that they have not applied again for coverage; why would they? Defendant has made its position clear. What is important is that but for CNA's policy position, from which Plaintiffs' claims arise, they

would be living in an MRC/ALSA and receiving coverage for it. Plaintiffs have asserted this is so, and absent any evidence to the contrary, that suffices for now.

### b.  Ms. Miller's Medical Eligibility

With respect to Ms. Miller's medical eligibility, Defendant contends that Ms. Miller is not able to be in an MRC/ALSA because she requires the level of care that only a chronic and convalescent care facility can provide. In support of this argument, Defendant points to a September 1, 2011 statement from the medical director of Whitney Manor, the skilled nursing care facility to which Ms. Miller moved when Defendant refused to cover an MRC/ALSA, in which the director wrote: "[r]esident is unable to manage her own care. She can not [sic] ambulate and stand unassisted. . . She can not [sic] live alone due to dementia. . . . Ms. Miller will require 24 [hour] care." (Ex. FFF to Opp'n.) Defendant additionally claims that "[a]t least one physician's order states that 'continued care at [skilled nursing facility] is required,'" and that reports prepared by Whitney Manor staff prove that "there has never been a plan to discharge Miller." (Opp'n at 18 (citing Exs. CCCC–GGGG to Opp'n).) Further, Defendant asserts, Ms. Miller's daughter, Patricia Folwer, "was recorded saying that 'maybe she [Ms. Miller] should go to a nursing home.'" (*Id.* at 17 (citing Ex. EEE[18] to Opp'n).)

Many of these quotes are however, partial quotes taken out of context. For example, although it is true that a September 2011 physician's order states that "continued care at [skilled nursing facility] is required," Defendant omitted the end of the sentence, which reads "for 30 days (1 month)/ 60 days (2 months)," likely reflecting the

---

[18] In fact, the referenced statement appears in Exhibit BBB to the Opposition, not Exhibit EEE.

fact that Ms. Miller needed skilled nursing care in September 2011 because she was recovering from a serious fall she took in June 2011. (Ex. CCCC to Opp'n; *see* Fowler Dep., Ex.. YY to Opp'n at 32; Fowler Dep. at 39 ("Q: She moved into Whitney manor to get rehabbed for the injuries that she sustained from the fall; is that correct?" "A: Right.").) Likewise, while the reports prepared by Whitney Manor staff do reflect that Ms. Miller did not have plans to leave the facility, Ms. Fowler explained that "[s]he stayed in Whitney Manor because CNA wouldn't pay for [an MRC/ALSA] and she would have had to pay out-of-pocket." (Fowler Dep. at 40.) Finally, although Ms. Fowler did state that "maybe she [Ms. Miller] should go to a nursing home," Defendant's quotation is selective and misleading. (Ex. BBB to Opp'n at 125.) Ms. Fowler's entire statement was: "But now since she fell, I'm thinking . . . you know, maybe she should go to a nursing home. Whether it be temporary or permanent. And the last person that I talked to there said that it doesn't matter whether it's temporary or permanent we have to start something with me getting paperwork or something?" (*Id.*)

That leaves the doctor's statement from September 2011. But, that statement alone does not establish that Ms. Miller is unable to live in an MRC/ALSA. First, the statement was made several months after Ms. Miller took a serious fall from which she was still recovering. Second, while the doctor stated that Ms. Miller needed 24 hour assistance, he did not state that she needed 24 hour *skilled nursing care*.[19] According to the Connecticut

---

[19] The Connecticut Department of Public Health defines "skilled nursing care" as including "wound care, physical assessment or physical/occupational/speech therapy, and/or medical social services," Conn. Dep't of Public Health, *Summary MRC Pamphlet*, at 2 (Aug. 30, 2006), *available at* http://www.ct.gov/dph/lib/dph/family_health/children_and_youth/pdf/mrc_summary_pamphlet.pdf, and explains that "[s]killed care and custodial care are terms used by the medical

Department of Public Health, ALSA "[s]taff members are available 24 hours per day to meet resident's needs," including providing "assistance with daily activities," providing "nursing services and medication supervision." Conn. Dep't of Public Health, *Managed Residential Communities and Assisted Living Services Agencies*, *available at* http://www.ct.gov/agingservices/lib/agingservices/manual/housing/mrcsandalsasfinal.pdf. "Activities of daily living may include assistance with hygiene, feeding, ambulation, dressing or incontinence." *Summary MRC Pamphlet* at 2. Defendant has not shown that this level of care would be insufficient for Ms. Miller.

### c. Ms. Miller's Remaining Benefits

Defendant's final argument with respect to the adequacy of Ms. Miller's representation is that Ms. Miller has used up all of the benefits to which she is entitled under her policy, and therefore, injunctive relief could not benefit her. In support of this proposition, Defendant cites the declaration of Daryl Lepak, a Claim Director employed by CNA, who testified that "Ms. Miller has been paid in excess of $450,000 in benefits and . . . her benefit maximum was reached in July of [2015]." (Ex. J to Opp'n ¶ 14.) The accuracy of this statement is, however, disputed by Plaintiffs. Moreover, if Plaintiffs prove

---

community, health insurance plans, Medicare, Medicaid and the Veterans Administration to differentiate care provided by medical specialists from care provided by aides, volunteers, family or friends," *Statewide Healthcare Facilities and Service Plan: October 2012*, at 71. Medicare defines "skilled nursing care" as: "Care given or supervised by registered nurses. Nurses provide direct care; manage, observe, and evaluate a patient's care; and teach the patient and his or her family caregiver. Examples include: giving IV drugs, shots, or tube feedings; changing dressings; and teaching about diabetes care. Any service that could be done safely by a non-medical person (or by yourself) without the supervision of a nurse isn't skilled nursing care." Medicare.gov, *Home Health Compare Glossary*, https://www.medicare.gov/HomeHealthCompare/Resources/Glossary.html.

that Ms. Miller was entitled to coverage for an MRC/ALSA, which is less expensive than the nursing home to which she ended up going, and that she would not have stayed at the nursing home but for Defendant's policy position, she may well be entitled to credits going forward for benefits she would not have used but for Defendant's policy position.

Accordingly, the Court finds that Ms. Foster and Ms. Miller are proper representatives of the proposed Rule 23(b)(2) class.

### B. Rule 23(b)(2)

Certification of a class under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "A class is appropriately certified under Rule 23(b)(2) 'where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury.'" *Warren*, 2004 WL 1562884, at *14 (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir. 2001)). "Rule 23(b)(2) does not require that all plaintiffs be identically situated. What is important is that the relief sought by the named plaintiffs [] benefit the entire class." *Id.* (internal quotation marks omitted).

Defendant contends that certification under Rule 23(b)(2) is not appropriate because "[i]t is unclear what injunctive relief plaintiffs seek," and "Rule 23(b)(2) 'does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.'" (Opp'n at 47–48 (quoting *Dukes*, 141 S.Ct. at 2557).) Defendant added at oral argument that certification

of a (b)(2) class is not proper because Plaintiffs seek primarily monetary relief, and in such circumstances, a (b)(2) class may not be certified.

The Court does not understand this argument. While Plaintiffs do seek monetary relief, it appears to the Court that what they primarily seek is forward-looking relief. Plaintiffs purchased long-term care policies, presumably with the expectation that they would utilize their coverage over a long term. Any adequate remedy would have to ensure that they could obtain coverage for claims prospectively. For that, an injunction is required. Moreover, Plaintiffs leave no ambiguity about the content of the injunction they seek: an end to Defendant's alleged policy of denying claims for assisted-living facilities across the board. This is exactly the type of relief Rule 23(b)(2) was designed to facilitate. Because Plaintiffs' proposed Rule 23(b)(2) class satisfied all of the requirements of Rule 23, certification is proper.

### C. Rule 23(b)(3)

A Rule 23(b)(3) class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Matters "pertinent to these findings include:"

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

33

*Id.*

### 1. Predominance

"Rule 23(b)(3)'s predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 239 (internal quotation marks omitted). "The requirement's purpose is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Id.* at 240 (internal quotation marks and alterations omitted). "Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (internal quotation marks omitted).

Defendant claims that predominance has not been shown here for all of the reasons recited above with respect to commonality, typicality, and adequacy, and also because damages will need to be determined on an individual basis. (Opp'n at 45.)

With respect to the arguments addressed in earlier sections of this ruling, the same reasoning used to reject those arguments earlier applies equally here. Specifically, whatever the individual issues that may need to be determined, the overriding question to which this suit addresses itself is one that is capable of class resolution—whether the policy (which Defendant admits to having) of denying all claims for coverage of MRC/ALSAs, demonstrates a breach of contract, unfair trade practice, or bad faith.

With respect to damages, while Defendant is correct that the Second Circuit has directed courts to consider whether damages may have to be determined on an individual basis in analyzing predominance, the Second Circuit has also emphasized that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach*, 778 F.3d at 405 (internal quotation marks omitted). Because Plaintiffs have demonstrated that questions of law or fact common to class members predominate over any questions affecting only individual members, a finding of predominance is appropriate, even though damages will likely need to be ascertained individually.

### 2. Superiority

"A class action is superior where class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency." *Mahon v. Chicago Title Ins. Co.*, 296 F.R.D. 63, 78 (D. Conn. 2013) (internal quotation marks and alterations omitted).

Defendant maintains that because the amount of damages Plaintiffs are seeking is not small, individual suits are not "unlikely or unfeasible."[20] (Opp'n at 46.) However, as Plaintiffs note, the damages they seek are not significant "relative to the cost of litigation against a massive insurer." (Mot. for Class Cert. at 17.) Moreover, "[w]here there is a need to remedy a common legal grievance, and where a class action serves to achieve economies of time, effort and expense, it is 'superior' to other forms of litigation even

---

[20] Defendant additionally argues that a class action is not the superior method of adjudicating this case because "cases so predominated by individual issues are found unmanageable." (Opp'n at 47.) However, given the Court's conclusion that common issues of fact and law, rather than individual issues predominate here, this argument requires no additional discussion.

though individual claims are large." *Bryan v. Amrep Corp.*, 429 F. Supp. 313, 318 (S.D.N.Y. 1977). In this case, because class-wide adjudication of Plaintiffs' claims would serve to efficiently resolve "the claims or liabilities of many individuals in a single action, as well as" eliminate the possibility of "repetitious litigation and possibly inconsistent adjudications," a class action is the superior method of litigation. *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272, 287 (D. Conn. 2013). Therefore, the Court certifies Plaintiffs' Rule 23(b)(3) subclass, as revised herein.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs' Motion [Doc. ## 108, 109] for Class Certification is GRANTED with modification. The Court certifies the following classes:

1. Rule 23(b)(2) Class:

> All current CNA long-term care insurance policyholders of the following policy forms — LTC 1 (Forms 15203/16356/17931) and Con Care B (Form 59433) who reside in Connecticut and whose policy was issued in Connecticut.[21]

The representatives of the class will be Plaintiffs Miller and Foster.

2. Rule 23(b)(3) Subclass:

> All Class members: (1) who were residing in a managed residential community ("MRC") and (2) receiving care from an assisted living services agency ("ALSA") (3) in the State of Connecticut; (4) who were medically eligible for benefits; (5) but were not afforded coverage for the costs of the MRC and ALSA; (6) on the grounds that the facility (a)

---

[21] Excluded from the class are: former policyholders, non-Connecticut residents, individuals who purchased policies outside of Connecticut, Defendant, members of Defendant's family, any entity in which Defendant has a controlling interest or is a parent or subsidiary of, or is controlled by, the Company, and the officers, directors, employees, affiliates, legal representative, heirs, predecessors, successors, and assigns of Defendant.

was not licensed by the state and/or (b) could not legally provide 24-hour-a-day, or continuous, nursing services/care and/or (c) did not provide daily medical records,[22] (7) who was not denied coverage for any other reason,[23] and (8) who suffered ascertainable damages as a result of being denied coverage.

The representatives of the subclass will be all named Plaintiffs.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 1st day of March, 2016.

---

[22] As discussed at oral argument, the Court adds this provision to ensure the comprehensiveness and clarity of the class definition.

[23] This clause is added for clarity.

37